[S.F. No. 23365. In Bank. May 24, 1976.]

MARIN COUNTY BOARD OF REALTORS, INC.,
Plaintiff, Cross-defendant and Respondent, v.
EUGENE PALSSON,
Defendant, Cross-complainant and Appellant.

## COUNSEL

Harold L. Howard and Quantz & Howard for Defendant, Cross-complainant and Appellant.

Evelle J. Younger, Attorney General, Warren J. Abbott and Anthony C. Joseph, Assistant Attorneys General, Michael I. Spiegel and William S. Clark, Deputy Attorneys General, John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and Jay J. Becker, Deputy District Attorneys, as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Bianchi, Hoskins & Rosenberg, Bagley, Bianchi, Hoskins & Rosenberg, Albert Bianchi and Hugh J. Cadden for Plaintiff, Cross-defendant and Respondent.

Moses Lasky, Malcolm T. Dungan and Brobeck, Phleger & Harrison as Amici Curiae.

## OPINION

**MOSK, J.**—We decide here for the first time the extent to which the state antitrust law circumscribes the practices of a multiple listing service

operated by a county board of realtors. We conclude that the Marin County Board of Realtors has violated the Cartwright Act (Bus. & Prof. Code, §§ 16720, 16726) by limiting its membership to persons primarily engaged in the real estate business and by denying nonmembers access to its multiple listing service.

The board is an incorporated real estate association affiliated with the California Real Estate Association and the National Association of Real Estate Boards. As of the time of trial in the present case, the board was composed of 777 associate members (salesmen), 255 active members (brokers), 50 affiliates and 4 honorary members. Three-fourths of the brokers actively engaged in selling residential real property in Marin County were members of the board.

The board provides a number of benefits to its members, the most important of which is the only multiple listing service for residential property operating exclusively in Marin County.[1] The multiple listing service is a system for pooling each member's listing in a central registry. A member obtaining a client who desires to sell real property forwards the listing to the multiple listing service. If the sale is eventually made through another member broker, the commission is divided between the selling and the listing broker.

The listings are available only to active and associate board members, who are prohibited by the board's bylaws from disseminating published listings to nonmembers. Although each active member may cooperate with nonmember brokers in selling his own listing, the actual extent of such cooperation is negligible. In 1972, out of 5,372 properties listed with the multiple listing service, only 51 were sold by nonmembers.

Eugene Palsson, a licensed real estate salesman, applied to the board for membership after obtaining employment with an active member. His application was denied because the board found that Palsson, an airline flight engineer, did not meet the requirements of one of the board's bylaws which provided that an associate member must be "primarily engaged in the real estate business." This provision was enforced through sanctions against an active member sharing offices with or employing a person denied membership in the board. Thus, a salesman

---

[1]The board points out Marin County sellers may list their properties with other services, but these are regional services not likely to have a substantial impact on the sale of property in Marin County.

denied membership was also denied employment with 75 percent of the residential brokers in Marin County.[2]

When Palsson contested the board's decision, the board brought suit in superior court, seeking a declaration that his exclusion was valid. Palsson filed a cross-complaint seeking declaratory relief, injunctions granting him board membership and access to the multiple listing service, and damages. The court, after nonjury trial, ruled in favor of the board on all issues, finding that the regulations in question were reasonable.

Before reaching the merits, we confront two preliminary issues. We must determine whether the Cartwright Act applies to the real estate industry and we must consider the board's contention that the case is now moot.

I

■ While neither of the parties raise the issue, the California Association of Realtors (CAR), in an amicus brief, maintains that the Cartwright Act does not apply to the sale of services. This theory, raised here for the first time, appears to be contrary to federal and state authority. Indeed, the United States Supreme Court has expressly held that the Sherman Act applies to the activity of real estate brokers. (*United States* v. *Real Estate Boards* (1950) 339 U.S. 485, 490-491 [94 L.Ed. 1007, 1013-1014, 70 S.Ct. 711].) ■ A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act. (See, e.g., *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]; *Sherman* v. *Mertz Enterprises* (1974) 42 Cal.App.3d 769, 775 [117 Cal.Rptr. 188]; *R. E. Spriggs Co.* v. *Adolph Coors Co.* (1974) 37 Cal.App.3d 653, 659, fn. 5 [112 Cal.Rptr. 585]; *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) 238 Cal.App.2d 225, 232 [47 Cal.Rptr. 570].)

■ Despite this line of authority, CAR contends the legislative history behind the Cartwright Act and its language contradict its

---

[2]Since a salesman must be employed by a broker in order to sell real estate (Bus. & Prof. Code, §10132; *Grand* v. *Griesinger* (1958) 160 Cal.App.2d 397 [325 P.2d 475]), denial of membership and employment substantially hinders a salesman from pursuing a career in the real estate field.

application to a service-oriented industry. The state law, insists the CAR, was patterned not after the Sherman Act, but on the then existing identically worded antitrust statutes of a number of states, notably Michigan. CAR then cites a turn-of-the-century Michigan case for the proposition that that state's antitrust law does not apply to the sale of human services. (*Hunt* v. *Riverside Co-operative Club* (1905) 140 Mich. 538 [104 N.W. 40].)

It is highly debatable that CAR's version of legislative history is accurate. Although the Cartwright Act is worded identically to Michigan's law, both statutes are near carbon copies of an earlier proposed amendment to the Sherman Act. The record of congressional debates reveals that this unsuccessful amendment was designed not to narrow the scope of the Sherman Act but to broaden it. Its author, Senator Reagan, declared, "I confess to a little surprise at the suggestion . . . that the amendment which I have submitted is different in character from the measure which he has reported . . . ." (21 Cong. Rec. 2564 (Mar. 24, 1890).) Indeed, he explained, "I have tried . . . to see if we could not devise a law that would arrest and prevent these trusts as far as the jurisdiction of Congress would go." (21 Cong. Rec. 2645 (Mar. 26, 1890).) Thus, it is difficult to infer from the annals of legislative history an intent to enact a law narrower in scope than the Sherman Act.

Even if CAR is correct in advising that we must look to the case law in states with identically worded statutes, the result is not helpful to its underlying theory. *Hunt,* the Michigan case cited by CAR for the proposition that the antitrust law does not apply to the sale of human services, actually stands for the far more narrow holding that the antitrust law did not prevent employers from fixing the wages paid to plumbers.[3] A more recent Michigan opinion, commended by CAR in another portion of its brief as "extensive and careful," declared, " 'The Michigan Act is patterned after the Sherman Act . . .' " and applied the state law to the activities of a multiple listing service operated by real estate brokers. (*Barrows* v. *Grand Rapids Real Estate Board* (1974) 51 Mich.App. 75 [214 N.W.2d 532, 536].) Other decisions construing statutes cast in the same language as the Cartwright Act have applied antitrust laws to realtors (*Bratcher* v. *Akron Area Board of Realtors* (6th Cir. 1967) 381 F.2d 723) and to insurance companies (*State* v. *American Surety Co.* (1912) 91 Neb. 22 [135 N.W. 365]).

---

[3]Other state cases cited by CAR are similarly inapposite. They are based on statutes that are materially different from the Cartwright Act and, in most cases, are narrower than the California statute.

CAR also refers to the provisions of Business and Professions Code section 16720, which defines a trust as a combination of capital, skill or acts by two or more persons "(a) To create or carry out restrictions in trade or commerce." While that language is as broad as any found in the Sherman Act, CAR observes that subsequent subdivisions, defining specific types of trusts, speak primarily of problems relating to "merchandise" or "commodities." These terms refer to goods, not services, asserts CAR, and the broad language of subdivision (a) must be read in that light to exclude services from its scope.

This inhibiting interpretation is insupportable in California case law, which has broadly defined "commodity" and just as liberally construed the provisions of the Cartwright Act. In *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34 [172 P.2d 867], we applied the act to an agreement among insurance underwriters and agents, holding both that insurance is "commerce" under subdivision (a) and a "commodity" under subsequent subdivisions. We also applied the Cartwright Act in *People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719 [264 P.2d 31] to the building maintenance contracting business, although only the sale of services was involved. And in *Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873, 886 [4 Cal.Rptr. 179, 351 P.2d 347], we stated flatly, "Although human labor is not a 'commodity' under the act (§ 16703), a service consisting in the main of human labor is."

The only limitation on the broad sweep of the Cartwright Act can be found in section 16703, which provides, "Within the meaning of this chapter, labor, whether skilled or unskilled, is not a commodity." This provision was apparently patterned after a similar portion of the federal Clayton Act (15 U.S.C. § 17) that was passed in response to federal court decisions applying the Sherman Act to proscribe activities of labor unions. (*Allen Bradley Co.* v. *Union* (1945) 325 U.S. 797, 802-803 [89 L.Ed. 1939, 1944-1945, 65 S.Ct. 1533].) As the *Messner* decision emphasizes, section 16703 was not designed to exempt the sale of services from the scope of the act. (*Ibid.*) Nor, contrary to CAR's suggestion, is it a herculean task to determine when an activity is excepted from the act's coverage. The relevant question, in every case, is whether the practice in question is meant to further the interest of tradesmen as employees in a collective bargaining context, or whether it is designed to advance their interests as entrepreneurs. While perhaps under some circumstances that distinction may be difficult to draw, in the present case it is beyond dispute that the practices of the Marin

County Board of Realtors bind the member as businessmen, not as employees engaged in collective bargaining with employers. Section 16703 is, then, inapplicable.

One can only speculate on CAR's insistence that the Legislature did not specifically consider the sale of services when it originally enacted the Cartwright Act. As CAR asserts, the act may have been passed in response to a Populist outcry against the commodity trusts that existed at the time of enactment. But the Cartwright Act, like the Sherman Act, is "couched in . . . comprehensive language" and "forbids combinations of the kind described with respect to every type of business." (*Speegle, supra*, 29 Cal.2d at p. 43.) Like many constitutional provisions written in general language, the provisions of the act must be interpreted in light of their inductive policy and in the context of changing conditions of society. Just as our founding fathers could not have envisioned electronic eavesdropping technology when they enacted the Fourth Amendment's prohibition against unreasonable searches and seizures, the legislators who passed the Cartwright Act may not have foreseen the large scale emergence of service-oriented industries. But even as the Fourth Amendment has been applied to electronic eavesdropping (*Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]), the policies behind the Cartwright Act compel its application to service industries. It is difficult to fancy the Populist authors of the act being indignant about cartels in the sugar beet industry and at the same time complacent if restraints of trade emerge in multi-million dollar insurance and real estate business enterprises. The conclusion is inescapable that the Cartwright Act applies to the present case.

## II

It is contended that the case before us is now moot. This claim is based on the board's assertion that while this case was pending appeal, the bylaw requiring that associate members be primarily engaged in the real estate business was deleted. The board maintains that the appeal now "presents only academic or abstract questions" and is thus rendered moot. (*Paul* v. *Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924].)

The board's position ignores both the pleadings in the present case and the applicable law regarding mootness claims. The trial court ruled not only on the board's prayer for declaratory relief, but also on Palsson's suit for injunctive relief and damages. Palsson sought to enjoin the board

from denying him access to the multiple listing service, an action which brought into question the board's rules limiting access to its members. As there is no indication that the board has changed the access rules, Palsson may still seek appellate relief. Moreover, he may also appeal on the issue of damages.

Palsson maintains he sustained economic harm as a result of the board's refusal of his membership application. This is a factual issue, which was not necessarily decided by the trial court. Although the court found, "Neither the Board nor any of its members have discriminated against Palsson or acted to prevent him from listing or selling real properties or sought otherwise to impede his efforts in the real estate business in any manner," the import of the finding is unclear. It may mean that Palsson suffered no damages because he was treated as if he were a member of the board, or it may indicate that while Palsson has been injured he has no valid complaint because the board's exclusionary policies were reasonable. If the latter interpretation is correct,[4] then the issue of damages relates to the validity of the board's regulations and is not moot.

Even the question of the validity of the board's "primarily engaged" rule is still justiciable, despite the board's deletion of the bylaw. Although the "primarily engaged" rule has been discontinued, there is no assurance that the board will not reenact it in the future. Indeed, it must be emphasized that the board itself initiated this lawsuit to have the rule declared valid and it prevailed in the courts below. As a federal court has pointed out in an antitrust case, "It is settled that the voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed." (*United States* v. *Insurance Board of Cleveland* (N.D.Ohio 1956) 144 F.Supp. 684, 691.) It is equally well settled that an appeal will not be rendered moot if the parties raise substantial questions of public interest that are likely to recur. (*Id.,* at p. 691; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 542 [63 Cal.Rptr. 21,

---

[4]This appears to be the case, as the following portion of the record demonstrates: "THE COURT: . . . So, the question in this case is whether the action of the board was proper. There is no question that the action of the board imposed a disadvantage upon Mr. Palsson, and you are entitled—you really don't have to show that. You are entitled to show the monetary extent of that disadvantage, if you can, and then the next question is whether that disadvantage is a result of proper or improper action on the part of the board."

432 P.2d 717].) In the case at bar, the importance of the questions involved is partly shown by the appearance of the California Association of Realtors, the Attorney General, and the District Attorney of Los Angeles County through amicus briefs. We are advised that a number of similar cases are pending in various trial courts. The issues raised are of substantial interest not only to real estate boards and home-buyers but also to all trade associations and their members, and to consumers in general. As the case is justiciable, we turn now to its merits.

## III

This matter is one of first impression in California,[5] and only a handful of published opinions have dealt with the issues involved; these were decided in a variety of factual and legal contexts and reached divergent results based on varying rationales.[6] We must, therefore, rely extensively on the general principles underlying federal and state antitrust decisions.

■ The threshold question is whether the practices of the board should be judged per se violations of the Cartwright Act or reviewed under the "rule of reason" standard. In general, only unreasonable restraints of trade are prohibited. (*Standard Oil Co.* v. *United States* (1911) 221 U.S. 1 [55 L.Ed. 619, 31 S.Ct. 502].) However, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate

---

[5]In *Jones* v. *San Bernardino Real Estate Board* (1959) 168 Cal.App.2d 661 [336 P.2d 606], the Court of Appeal upheld a real estate association's membership restriction similar to that in the case at bar. However, the court did not discuss either antitrust law or the possible relationship between membership in a real estate association and access to a multiple listing service. The decision, thus, is of little help to us.

[6]See *Barrows* v. *Grand Rapids Real Estate Board* (1974) *supra*, 214 N.W.2d 532 (exclusion of nonmembers of real estate board from multiple listing service upheld under common law and state antitrust law, where nonmembers were substantially able to compete and majority of sales in the area were not made through the service); *Collins* v. *Main Line Board of Realtors* (1973) 452 Pa. 342 [304 A.2d 493] (exclusion of nonmembers from multiple listing service held per se common law restraint of trade); *Oates* v. *Eastern Bergen Co. Multiple List. Serv., Inc.* (1971) 113 N.J.Super. 371 [273 A.2d 795] (formation of closed corporation to operate multiple listing service involving substantial sales held per se violation of state antitrust laws); *Grempler* v. *Multiple List. Bureau* (1970) 258 Md. 419 [266 A.2d 1] (restriction of multiple listing service to members held reasonable, even though a woman was denied membership on the basis that her main office was in another county); and *Grillo* v. *Bd. of Realtors of Plainfield Area* (1966) 91 N.J.Super. 202 [219 A.2d 635] (denial of access to nonmembers found to be unreasonable restraint of trade under common law principles).

inquiry as to the precise harm they have caused or the business excuse for their use." (*Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].) Among these per se violations is the concerted refusal to deal with other traders, or, as it is often called, the group boycott. (*Ibid; Klor's* v. *Broadway-Hale Stores* (1959) 359 U.S. 207, 212 [3 L.Ed.2d 741, 744-745, 79 S.Ct. 705].)

Palsson asserts that the board's access rule and its "primarily engaged" by-law constitute a group boycott. Under the access rule, the members of the board have agreed to withhold from nonmembers information on multiple listings, an agreement which could be interpreted as a concerted refusal to deal. The "primarily engaged rule," argues Palsson, is an agreement by member brokers not to employ licensed part-time sales-men, and, as such, is also a group boycott.

Although this proposition is superficially plausible, we hesitate before mechanically applying a per se rule. Adopting such a rule would establish the activities of the board to be illegal without any regard to their economic effects or possible justification. As applied to the access rule, the per se standard of review could lead to the conclusion that an association which provides any economic benefit to its members would be compelled to provide that same benefit to nonmembers. Two independent real estate brokers could not permissibly agree to share their listings with each other, unless they also provided for access to the other 250 brokers in their county. Similarly, if the "primarily engaged" rule were struck down without regard to its economic effect or possible justification, trade associations would be forced to open their doors to anyone permitted by law to practice the profession. Before acceding to the demand for such a formidable rule, we must decide whether it is justified under applicable case law.

In the leading case of *Klor's* v. *Broadway-Hale Stores* (1959) *supra,* 359 U.S. 207, a large department store was charged with persuading wholesalers to refuse to sell to a smaller store on the same block or to sell to it at discriminatory prices. The court held that the activity alleged in the complaint constituted an unreasonable restraint of trade, irrespective of the magnitude of its economic effects or the justification for the alleged practices of the defendant.

The other leading case applying the per se standard to a boycott is *Fashion Guild* v. *Trade Comm'n* (1941) 312 U.S. 457 [85 L.Ed. 949, 61 S.Ct. 703], in which the court struck down an agreement by a

manufacturers' guild to refuse to sell to retailers who allegedly "pirated" their original dress designs. The court refused to consider the justification for the boycott, holding that the guild's agreement "has both as its necessary tendency and as its purpose and effect the direct suppression of competition from the sale of unregistered textiles and copied designs. [Citation.]" (*Id.*, at p. 465 [85 L.Ed. at p. 953].)

*Klor's* and *Fashion Guild* have been extensively analyzed both in legal journals and in the courts. Most of the commentators conclude that the practices condemned in the two cases represent a particular type of predatory activity distinguishable from many alleged boycotts.[7] The suggested distinction is between direct boycotts aimed at coercing parties to adopt noncompetitive practices and indirect boycotts which result in refusals to deal only as a byproduct of the agreement. "When the element of purpose to coerce the trade policy of third parties or to secure their removal from competition is absent, the policy question raised by agreements under which the parties mutually limit their own freedom to deal with outsiders becomes more difficult, and the courts have appropriately outlined wider limits before declaring such agreements illegal." (Barber, *Refusals to Deal Under the Federal Antitrust Laws* (1955) *supra,* 103 U.Pa.L.Rev. 847, 876.)

This limitation on the per se rule is particularly applicable to trade association agreements not directly aimed at coercing third parties and eliminating competitors. In cases involving such agreements, courts have generally applied the rule of reason test. In *Associated Press* v. *United States* (1945) 326 U.S. 1 [89 L.Ed. 2013, 65 S.Ct. 1416], the bylaws of the Associated Press, a cooperative association engaged in gathering and distributing news, prohibited service of AP news to nonmembers, prohibited members from furnishing news to nonmembers, and empowered members to block the membership applications of competitors. The court affirmed a trial court finding that the bylaws limiting access to the wire service news, when combined with the membership restrictions, violated the Sherman Act. However, the court refused to hold that the access bylaws were by themselves antitrust violations, absent a more thorough exploration of the facts. (*Id.*, at p. 22 [89 L.Ed. at

[7]See, e.g., *Barrows* v. *Grand Rapids Real Estate Board* (1974) *supra,* 214 N.W.2d 532, 543; Austin, *Real Estate Board and Multiple Listing Systems as Restraints of Trade* (1970) 70 Colum.L.Rev. 1325, 1341 (hereinafter cited as Austin); Rahl, *Per Se Rules and Boycotts Under the Sherman Act: Some Reflections on the Klor's Case* (1959) 45 Va.L.Rev. 1165, 1172; Barber, *Refusals to Deal Under the Federal Antitrust Laws* (1955) 103 U.Pa.L.Rev. 847, 876; Case Comment (1967) 21 Rutgers L.Rev. 547, 558.

pp. 2031-2032].) Throughout the opinion, the court stressed the predominance of the AP in the news-gathering field, noting that a restrictive agreement by the nation's largest news-gathering agency presents a far different problem than would an exclusive news-sharing agreement between two newspapers in different cities. (*Id.,* at p. 14 [89 L.Ed. at p. 2027].)

While *Associated Press* was decided prior to *Klor's,* most of the post-*Klor's* opinions have applied the rule of reason test to the noncoercive agreements of voluntary associations.[8] This trend, while not universal,[9] indicates a recognition by the courts that trade associations

[8]See, e.g., *Marjorie Webster Jr. Col.* v. *Middle States Assn. of C. & S. S.* (D.D.C. 1969) 302 F.Supp. 459, reversed on other grounds, *Marjorie Webster Jr. Col.* v. *Middle States Assn. of C. & S. S.* (1970) 432 F.2d 650 [139 App.D.C. 217] (agreement to grant accreditation only to nonprofit colleges); *Deesen* v. *Professional Golfers' Association of America* (9th Cir. 1966) 358 F.2d 165 (exclusion of golfer from PGA tournaments on grounds he was not good enough to compete); *Molinas* v. *National Basketball Association* (S.D.N.Y. 1961) 190 F.Supp. 241 (exclusion of convicted gambler from NBA); *United States* v. *Insurance Board of Cleveland* (N.D.Ohio 1960) 188 F.Supp. 949 (agreement by association of insurance agents excluding from membership agents who handled business of mutual agency companies); *Barrows* v. *Grand Rapids Real Estate Board* (1974) *supra,* 214 N.W.2d 532 (exclusion of nonmembers of real estate board from multiple listing service); and *Union Circulation Company* v. *Federal Trade Com'n* (2d Cir. 1957) 241 F.2d 652 (pre-*Klor's* decision applying rule of reason to agreement of magazine subscription agencies not to hire any salesman for a period of one year after he left employment of any member agency).

The rule of reason has also been used to evaluate alleged group boycotts outside of the voluntary association context. (See, e.g., *Dalmo Sales Co.* v. *Tysons Corner Regional Shopping Center* (D.D.C. 1970) 308 F.Supp. 988 (action by department stores excluding plaintiff appliance dealer from shopping center); *Savon Gas Stations Number Six, Inc.* v. *Shell Oil Company* (4th Cir. 1962) 309 F.2d 306 (restrictive covenant in lease agreement between shopping center and oil company providing that center would not lease to competitor of oil company).)

[9]Decisions applying the per se rule to associational noncoercive practices include the above-cited *Collins* v. *Main Line Board of Realtors* (1973) *supra,* 304 A.2d 493, and *Oates* v. *Eastern Bergen County Multiple List. Serv. Inc.* (1971) *supra,* 273 A.2d 795. In *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) 238 Cal.App.2d 225 [47 Cal.Rptr. 570], the Court of Appeal labeled as a per se violation a bowling proprietors' association rule providing that bowlers could compete in association tournaments only if they bowled a certain number of league games in member houses. The court found that such a rule was intended to coerce bowlers into abandoning nonmember establishments and frequent those owned by members.

*Silver* v. *New York Stock Exchange* (1963) 373 U.S. 341 [10 L.Ed.2d 389, 83 S.Ct. 1246], is also sometimes cited to show the general applicability of the per se rule. In that case, two Texas over-the-counter brokers and dealers in securities arranged with members of the New York Stock Exchange for direct telephone connections with a number of firms. The exchange told the firms to disconnect the telephones, substantially damaging the business of the Texans. The court found that the Sherman Act was violated, although its rationale is not entirely clear. While the opinion begins with language indicating the finding of a per se violation, the court then proceeds to examine

may perform beneficial services for their members and society. (Austin, *op. cit., supra,* p. 1347, fn. 136.) In the course of providing these benefits, the associations often exclude nonmembers. But such exclusion, unless directly aimed at eliminating competition, can rarely be said to be so inherently destructive or so devoid of any discernible benefit that the courts must condemn the policy without exploring its effects or the underlying rationale.

Thus, the rule of reason seems applicable to the present case. Neither the access rule nor the "primarily engaged" rule appears to be the type of predatory practice condemned in *Fashion Guild* and *Klor's.* As one commentator put it, "Real estate boards are basically self-restricting entities. . . . [T]he primary intent of the association is to impose internal, not external, restraints. While nonmember brokers are excluded from the advantages of board facilities and, as a result of nonaccess to multiple listing services, foreclosed from market opportunities, these consequences are ancillary and incidental products of internal restraints. . . . Since the primary objective is not the destruction of particular brokers or of nonmember brokers as a class, the *Klor's* principle, that a group boycott designed to coerce directly is per se unlawful, should not apply." (Austin, *op. cit., supra,* pp. 1340-1341.) Thus, we proceed to analyze the board's policies under the rule of reason test.[10]

## IV

Under the rule of reason standard, pursuant to the salutary purposes of the antitrust law, we must analyze the economic effects of

and reject various justifications for the exchange's practice and also attacks the lack of procedural due process granted the plaintiffs. The latter part of the decision has led at least two commentators to conclude that *Silver* applied the rule of reason. (Note, *Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason* (1966) 66 Colum.L.Rev. 1486, 1487-1488; *The Supreme Court, 1962 Term* (1963) 77 Harv.L.Rev. 62, 156.) Others have interpreted *Silver* as a per se case, a circumstance which justifies the criticism of one writer that "The judgment of history must surely be that the courts and the legal profession have been far more successful in the results achieved in antitrust cases than in their efforts to articulate the ideas involved." (Rahl, *Per Se Rules and Boycotts Under the Sherman Act: Some Reflections on the Klor's Case* (1959) *supra,* 45 Va.L.Rev. 1165, 1168.)

[10]We recognize that in rejecting a per se rule in this case we are sacrificing some advantages, i.e., the facilitation of judicial certainty and the saving of litigation costs. (*Northern Pac. R. Co.* v. *United States* (1958) *supra,* 356 U.S. 1, 5.) But the cost need not be significant. If a particular regulation is declared invalid under the rule of reason, both the courts and parties in a future case may contemplate that a similar rule in a comparable industry having like economic effects will also be held invalid. Adoption of the rule of reason does not preclude application of the doctrine of stare decisis.

the board's practices and then consider possible justifications for the practices. (*Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238 [62 L.Ed. 683, 687, 38 S.Ct. 242].)

Antitrust laws are designed primarily to aid the consumer. They rest "on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." (*Northern Pac. R. Co.* v. *United States* (1958) *supra,* 356 U.S. 1, 4 [2 L.Ed.2d 545, 549].)

Another beneficiary of antitrust law is the competitor himself. The preservation of competition, while indirectly aiding society by producing lower prices and higher quality goods and services, directly aids the scrupulous trader by insuring him a fair opportunity to compete on the market. An anticompetitive practice "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." (*Klor's* v. *Broadway-Hale Stores* (1959) *supra,* 359 U.S. 207, 213 [3 L.Ed.2d 741, 745].)

Viewed in the light of these purposes, the practices of the board pose serious anticompetitive dangers both to licensed real estate salesmen and brokers and to consumers. In evaluating the effects of the board's practices we consider as relevant the residential housing market in Marin County. In this market, the board and its multiple listing have substantial impact. Three-fourths of the brokers actively selling residential real property were members of the board at the time of trial. In 1972 alone, the multiple service listed 5,372 properties. Of those, 2,964 were sold through the multiple listing service for $131,222,396, accounting for 35 percent of the total dollar sales of all real property in Marin County and a presumably much higher percentage of the sales dollars for residential property.

The problems of a nonmember of the board in competing against this colossus are manifest. As the board's own advertising in an area newspaper points out, Marin County homeowners selling through the multiple listing service in 1972 "got 225 Realtor members of the Marin County Board of Realtors and a sales force of over a thousand realty experts working for them. This makes short work of selling desirable

property at profitable prices." By contrast, the success of a nonmember "in obtaining listings or locating properties for sale—his 'stock in trade'—is governed and limited by his own efforts, contacts and abilities. He has only a limited supply of 'shoes on the shelves.' His commissions on selling are limited by that supply, and if buyers come to him to find out what he has to sell the same limitations apply." (*Oates* v. *Eastern Bergen Co. Multiple List. Serv., Inc.* (1971) *supra,* 273 A.2d 795, 800.) Under these circumstances, one does not need an advanced degree in economics to predict whose services a buyer or seller of a home is likely to engage. The access rule, in short, seriously hampers the competitive effectiveness of nonmember licensed brokers and salesmen.[11]

Moreover, the "primarily engaged" rule inflicts particularly severe economic detriment on a part-time salesman. Denied membership in the board, he may not be employed by three-fourths of the residential real estate brokers in Marin County. And, unless employed by a licensed broker, he may not legally sell real estate. (Bus. & Prof. Code, § 10132.) Thus both rules seriously hamper a nonmember's ability to compete effectively in the real estate industry.

The buyer or seller of a home also suffers by the board's practices, although this injury is somewhat less evident. It may be argued that consumers are not being denied any housing information; all they must do is engage the services of a board member with access to the multiple listing service. A similar argument was answered by the Supreme Court in *Associated Press* v. *United States, supra,* 326 U.S. at page 18 [89 L.Ed. at page 2029]: "therefore, it is said, AP and its member publishers have not deprived the reading public of . . . news, since all they need do in any city to get it is to buy, on whatever terms they can in a protected market, the particular newspaper selected for the public by AP and its members. We reject these contentions. [They] fly in the face of the language of the Sherman Act and all of our previous interpretations of it." The present case is comparable to *Associated Press* in that the board's practices, like

---

[11]Although this case deals primarily with a salesman, we see no reason to distinguish between a salesman and a broker with respect to the access rule. Nonmember brokers, like nonmember salesmen, are of course denied access to the multiple listing service and are thus injured by the rule to the same extent as salesmen. Moreover, the possible justifications for both rules—insuring professional and ethical competence and preserving autonomy over provision of benefits and membership selection—apply equally to both groups. The only difference between the two groups is in the injury caused by the "primarily engaged" rule. While parttime brokers are excluded from membership by a separate "primarily engaged" bylaw, such exclusion does not prevent them from earning a living to the same extent that it reacts upon salesmen, who may not sell real estate unless employed by a broker.

the AP bylaws, tend to limit entry into a competitive field by making it difficult for nonmembers to compete effectively with members.[12] Consumer choice is thereby narrowed. A person wishing to sell or buy a home may believe that a particular nonmember is more competent than available members. But if the consumer wishes to have ready access to a large market in a short period of time, he may be forced to deal with a less desirable member broker or salesman.

This narrowing of choice may have an effect on the commissions a consumer must pay for brokerage service. Although no evidence has been offered on this issue, a nonmember, particularly a part-time broker not entirely dependent on real estate for his income, may be willing to accept a fee lower than the prevailing commission. Moreover, he may be less subject to the informal and often unspoken peer group pressure that some commentators indicate is responsible for maintaining standard prices in many industries. In short, the regulations imposed by the board have a deleterious effect both on competitors and consumers.

We must weigh these anticompetitive effects against the possible justifications for the board's practices. The primary rationale for denying nonmembers access to the multiple listing service appears to be that the board has a right to make membership desirable by providing attractive benefits. Certainly, "an association cannot continue to exist if its activities are completely and unconditionally opened to outside participation. It is only through its activities that an association attracts and holds membership." (Bodner, *Antitrust Restrictions on Trade Association Membership and Participation* (1968) 54 A.B.A.J. 27, 32.) An association may, for example, require membership eligibility for participation in an educational seminar, even when the seminar may provide an economic benefit.

■ An association's freedom to exclude nonmembers from its activities is not absolute. It must yield to antitrust laws when (1) its activities begin to correspond directly with and touch upon the business activities of its members; and (2) the association has the power to shape and influence the economic environment of its particular market. (Austin, *op. cit., supra*, p. 1345.) In the real estate field, "Since a

[12]It is not necessary for Palsson to prove that many brokers and salesmen have actually left the real estate field or declined to enter because of failure to obtain membership. When, as in the present case, a practice has a tendency to restrain trade, it may violate antitrust law, "whether it be 'wholly nascent or abortive on the one hand, or successful on the other.'" (*Id.*, at p. 12 [89 L.Ed. at p. 2026].)

board-sponsored multiple is directly engaged in the buying and selling process, its duplicatory connection with the business interests of individual brokers is manifest." (*Id.,* at pp. 1345-1346.) And, as we have seen, the board's ability to shape the economic environment of the Marin County residential brokerage market is substantial. While the Marin County Board of Realtors may permissibly provide some exclusive benefits to its members, access to the multiple listing service is so essential to nonmembers if they are to compete effectively that such access must be granted to all licensed salesmen and brokers who choose to use the service.

The "primarily engaged" rule is sometimes justified on the grounds that the board has the right to choose its own members. ▪ It has never been the law in California that a voluntary association may be forced to open its membership rolls to all who apply. On the other hand, when membership in an association is a practical economic necessity, judicial review is available to examine bases for exclusion from membership. (*Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 165 [81 Cal.Rptr. 623, 460 P.2d 495], citing *Falcone* v. *Middlesex County Medical Soc.* (1961) 34 N.J. 582 [170 A.2d 791, 799, 89 A.L.R.2d 952].) In the case at bar, even if the access rule is eliminated, membership in the Marin County Board of Realtors must be termed a practical economic necessity for real estate salesmen. As noted above, without membership in the board, a salesman is denied employment with 75 percent of the residential real estate brokers in the county and a subsequent reasonable opportunity to earn a livelihood in real estate. The economic benefits of membership mandate that exclusion be subject to judicial review.[13]

However, the availability of judicial review does not prevent the board from setting reasonable standards for admission. The issue becomes the type of standards which are permissible. In *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550 [116 Cal.Rptr. 245, 526 P.2d 253], we required only that an association's membership rules be rationally related to legitimate purposes and fairly applied. But in *Pinsker* we did not deal with allegations of antitrust violations and thus were not confronted with the same policy considerations facing us today. In the present case, it has been demonstrated that the board's "primarily

---

[13]We emphasize that the question before us concerns the validity of the "primarily engaged" rule in conjunction with other board bylaws effectively denying employment to nonmember salesmen. The question of availability of judicial review for an exclusion from membership, absent the access rule and the employment rules, is not before us.

engaged" rule poses serious anticompetitive dangers to society. In such a case, the rule of reason requires not only a demonstration that the anticompetitive practice relates to a legitimate purpose, but also that it is reasonably necessary to accomplish that purpose and narrowly tailored to do so.

In *Union Circulation Company* v. *Federal Trade Com'n* (2d Cir. 1957) *supra*, 241 F.2d 652, a federal court used the rule of reason to invalidate an agreement among magazine subscription solicitation agencies not to hire any salesman who had been employed by another agency during the past year. The agencies argued that the agreement was enacted to police the industry and was directed at personnel who had engaged in deceptive sales practices. But the court, noting that the agreements could be invoked against salesmen with unblemished records as well as against those targeted, declared, "The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices." (*Id.,* at p. 658.)

In this case, the board claims that its "primarily engaged" rule operates to further the professional and ethical competence of the real estate profession, surely a legitimate goal. A full-time salesman, maintains the board, will be more likely to educate himself on developments in the field and will have more time to devote to his clients.

This rationale can be challenged on two grounds. First, the purported necessity for the "primarily engaged" rule is minimal in light of the extensive state regulation of the real estate industry. (Bus. & Prof. Code, §§ 10130-10483.) These statutory regulations are comprehensive, covering everything from licensing and disciplining to out-of-state land promotions. One of the provisions includes a requirement that a real estate salesman can become a broker only after having been *actively* —not necessarily *primarily*—engaged in the business of real estate salesman for at least two years. (Bus. & Prof. Code, § 10150.6.) While the existence of regulatory statutes does not per se preempt the field and prevent the Marin County board from setting its own internal standards, the legislatively enacted scheme does call into question the professional need for the board to act as an extra-governmental agency. (*Collins* v. *Main Line Board of Realtors* (1973) *supra,* 304 A.2d 493, 497; *Grillo* v. *Bd. of Realtors of Plainfield Area* (1966) *supra,* 219 A.2d 635, 648; Case Comment (1967) *supra,* 21 Rutgers L.Rev. 547, 573.)

Second, the board has failed to establish that the "primarily engaged" rule facilitates an increase in professional or ethical competence in all or

most cases. A priori, there is no reason to believe that a full-time salesman will spend more time in self-education or with a particular client than would one serving part-time. Indeed, a part-time salesman, whose other sources of income may enable him to carry a much smaller clientele than his full-time counterpart, conceivably might have more leisure to devote to self-improvement or to aiding his client.

Even if the board's assumptions about part-time salesmen were empirically valid in many cases, the "primarily engaged" rule is too broadly drawn in light of its anticompetitive effects. If the board seeks to encourage further professional education and devotion to clients, the board could consider regulations aimed directly at those goals. The "primarily engaged" rule, by excluding from membership all part-time salesmen, including the most ethical, highly qualified and dedicated among them, is an anticompetitive regulation which, like the access rule. cannot be justified under the rule of reason.

V

We now ascertain the appropriate disposition of the various claims. The case, it will be remembered, arose in the context of a suit initiated by the board seeking a declaratory judgment that its exclusion of Palsson was valid and a cross-complaint by Palsson seeking damages and injunctive relief. The declaratory relief and damage issues are easily disposed of: the board is not entitled to the former and Palsson is entitled to a factual determination of the latter.

The injunctive aspect of the case is more difficult. The fashioning of a decree in an antitrust case in order to prevent future violations and eradicate existing evils is a matter for the trial court. (*Associated Press* v. *United States* (1945) *supra,* 326 U.S. 1, 22 [89 L.Ed. 2013, 2031-2032].) For the guidance of the court a broad framework for relief may be helpful. The board's rules denying access of nonmembers to the multiple listing service must be eliminated, although nonmembers may be charged a reasonable fee for use of the service consistent with the per-capita costs of operation. In addition, as long as membership in the board is necessary for employment by an active member, the board should be enjoined from enforcing or promulgating any bylaw or other rule which conditions associate membership on primary engagement in the real estate industry.

The judgment, insofar as it grants declaratory relief on the complaint, is reversed. Insofar as it denies relief on the cross-complaint, the judgment is reversed and remanded with directions to determine the issue of damages and to fashion appropriate relief consistent with the views expressed in this opinion.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Richardson, J., concurred.