[No. B187172. Second Dist., Div. Four. Mar. 23, 2007.]

LORI RUBINSTEIN PHYSICAL THERAPY, INC., et al., Plaintiffs and Appellants, v.
PTPN, INC., et al., Defendants and Respondents.

1132

Counsel

The Foundation for Taxpayer and Consumer Rights, Harvey Rosenfield, Pamela Pressley; Blecher & Collins, Maxwell M. Blecher and James Robert Noblin for Plaintiffs and Appellants.

Hooper, Lundy & Bookman, Blake R. Jones and Jay N. Hartz for Defendant and Respondent PTPN, Inc.

Hogan & Hartson, Gary L. Urwin and Richard L. Stone for Defendant and Respondent Blue Cross of California.

Opinion

WILLHITE, J.—In 1982, the California Legislature enacted legislation that paved the way for the proliferation of a new kind of health care service plan, the preferred provider organization (PPO). That year, the Legislature amended Insurance Code section 10133 to allow private health insurers to contract with hospitals and providers of medical services for alternative rates of payment for those services, thus permitting insurers to create panels of "preferred providers" for the insurers' subscribers. That amendment was followed a few years later by legislation that enables providers to form groups or combinations to more efficiently negotiate with insurers to become preferred providers. In doing so, the Legislature immunized certain conduct from antitrust liability. In this case, we are asked to determine whether the conduct of one such group of providers (which imposed territorial restrictions on its members) and one insurer (which made the members of that group the virtually exclusive preferred providers for physical therapy services) comes within the scope of this immunity. We hold that it does.

## BACKGROUND[1]

There are two named defendants in this lawsuit. The first is PTPN, Inc., a corporation that was founded by independently owned and licensed physical

---

[1] Because this appeal comes to us following the granting of motions for judgment on the pleadings, which are equivalent to demurrers (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146 [44 Cal.Rptr.2d 441, 900 P.2d 690]), our statement of facts is based upon the allegations of the second amended complaint. "[W]e treat as true all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] However, we disregard allegations that are contrary to law or to facts that may be judicially noticed [citation] or are

therapy practices to negotiate with health insurers to become a preferred provider group. The second is Blue Cross of California, one of the insurers with whom PTPN negotiated alternative rates of payment. PTPN, which is alleged to be the largest group of physical therapy providers in California, limits its membership based in part upon geographic considerations; it does not allow new members whose practices are located within a certain radius of an existing member's practice. For the most part, the members of PTPN are the exclusive preferred providers of physical therapy services for Blue Cross, which is alleged to be the largest provider of PPO coverage in California.[2] PTPN also has contracted with many other insurers, including most managed care organizations in the country, to make PTPN members the preferred providers of physical therapy services for those insurers.

Under the Blue Cross PPO plan, a member of PTPN who provides physical therapy services to a Blue Cross subscriber will receive the negotiated rate of payment as a preferred provider directly from Blue Cross. If a Blue Cross subscriber receives treatment from a physical therapist who is not a preferred provider, the subscriber must pay for the treatment and may receive a small portion of that payment as reimbursement from Blue Cross.

Plaintiffs Lori Rubinstein Physical Therapy, Inc., and One on One PT are providers of physical therapy services. They are not, however, members of PTPN, and are not preferred providers for Blue Cross's PPO plan. They filed the instant action on behalf of themselves and all other non-PTPN-affiliated physical therapist providers in California (they estimate there are tens of thousands of such providers). Plaintiffs allege that PTPN and Blue Cross violate California's antitrust and unfair competition laws (Bus. & Prof. Code, §§ 16720, 17200 et seq.) by engaging in an improper market allocation (through PTPN's geographic restrictions) and a group boycott (through Blue Cross's exclusive contract with PTPN). They assert that Blue Cross's exclusive arrangement with PTPN and PTPN's restrictions on membership unlawfully restrain competition for Blue Cross insured patients and have foreclosed actual and potential competitors of PTPN members from competing on the

---

contradicted by the express terms of an exhibit incorporated into the complaint. [Citation.]" (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 178, fn. 3 [91 Cal.Rptr.2d 534].)

[2] The complaint alleges there are some physical therapists who are not members of PTPN who are preferred providers for Blue Cross "for idiosyncratic reasons"—e.g., some may have been "grandfathered" into their status as preferred providers, and some are affiliated with physician groups that are preferred providers.

merits for patients with private health insurance. They assert this restraint on competition has resulted in higher prices to patients, less innovation, less variety in service offerings, and lower quality in physical therapy services.[3] They seek an injunction prohibiting PTPN and Blue Cross from imposing any geographic restrictions on members of PTPN, from imposing a group boycott against non-PTPN members, and from making PTPN the exclusive physical therapy providers for any insurer.

PTPN and Blue Cross moved for judgment on the pleadings.[4] The trial court granted their motions, finding that the conduct at issue was authorized by statute and that plaintiffs failed to allege an antitrust violation under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) or under Business and Professions Code section 17200. Plaintiffs appeal from the judgment.

## DISCUSSION

A. *The Legislative Scheme Facilitating PPO Plans*

■ Antitrust laws "rest 'on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.' [Citation.]" (*Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 935 [130 Cal.Rptr. 1, 549 P.2d 833].) As one treatise explains, "Antitrust laws place primary reliance on market forces to discipline economic behavior. If a monopoly or a cartel is created, the antitrust laws may be invoked to restore a situation of diffused power, but once that competitive balance is restored, there should be

---

[3] For example, plaintiffs allege that Blue Cross subscribers may not be able to receive the physical therapy they need because some PTPN members have more patients than they can adequately serve and thus limit their appointments to 15 minutes rather than a full hour, or because the PTPN member practicing in the subscriber's location may not be qualified to provide certain specialized treatments.

[4] There were, in fact, several motions for judgment on the pleadings. PTPN and Blue Cross filed two motions, one asserting statutory authorization and the other asserting lack of antitrust injury, directed at the first amended complaint (plaintiffs filed the first amended complaint before serving the original complaint on either defendant). The trial court granted those motions with leave to amend. Plaintiffs filed a second amended complaint containing minor revisions. Noting there was little difference between the first and second amended complaints, the trial court deemed the original motions for judgment on the pleadings to be motions directed to the second amended complaint, and allowed the parties to file supplemental briefs. The parties did so, and the court subsequently granted the motions without leave to amend and entered judgment against plaintiffs.

no need for continuing government oversight. The 'invisible hand' of the market provides the discipline, so no regulators or bureaucrats are required once the proper competitive balance is restored." (Sullivan & Grimes, The Law of Antitrust: An Integrated Handbook (2000) § 1.3, pp. 5–6, fn. omitted.) Thus, ordinarily, antitrust laws are invoked to condemn restraints on competition such as market allocations and group boycotts because it is understood that market forces unhampered by these restraints will restore a proper competitive balance and produce the most efficient allocation of resources.

But, as many commentators acknowledge, unique aspects of the health care market serve to distort the market forces and make it less likely that market forces alone will produce efficient allocation, high quality, and lower prices. (See, e.g., Greaney, *Chicago's Procrustean Bed: Applying Antitrust Law in Health Care* (2004) 71 Antitrust L.J. 857, 858, 863–866; Sage & Hammer, *Competing on Quality of Care: The Need to Develop a Competition Policy for Health Care Markets* (1999) 32 U. Mich. J.L. Reform 1069, 1072–1073; Sullivan & Grimes, The Law of Antitrust: An Integrated Handbook, *supra*, § 13.4, pp. 670–671.) Indeed, as a result of these distortions, health care costs soared in the absence of government intervention and regulation. (Woo, *Antitrust and California's New Preferred Provider Organization Legislation: A New Alternative in Health Care Cost Containment* (1984) 12 Pepperdine L.Rev. 121, p. 121, fn. 1 (hereafter Woo).)

In 1982, the California Legislature sought to contain those rising costs by enacting legislation designed to encourage the development of PPO plans. (Stats. 1982, ch. 329, § 8, p. 1613.) In a PPO plan, there is a designated panel of preferred providers with whom a third party payor has contracted to provide medical services to insureds at discounted rates. The providers agree to discount their rates in part because they are guaranteed a defined pool of patients who have an economic incentive to use a preferred provider. Although the insureds typically are not precluded from using providers who are not preferred providers, they have to pay significantly more for services from nonpreferred providers. (Woo, *supra*, 12 Pepperdine L.Rev., at pp. 124–125.)

To facilitate the development of PPO plans, the Legislature amended Insurance Code section 10133 to allow an insurer to "negotiate and enter into contracts for alternative rates of payment with institutional [and, after July 1, 1983, with professional] providers, and offer the benefit of these alternative rates to insureds who select those providers." (Ins. Code, § 10133, subds. (b), (e).) Alternatively, the Legislature permitted insurers to "limit payments under

a policy to services secured by insureds from institutional [and] professional providers, charging alternative rates pursuant to contract with the insurer." (Ins. Code, § 10133, subd. (c).)

The Legislature subsequently found in 1985, however, that individual providers "have not proven to be efficient-sized bargaining units for these contracts" and that groups or combinations of providers would be more efficient-sized contracting units for PPO plans. (Bus. & Prof. Code, § 16770, subd. (d); Ins. Code, § 10133.6; Health & Saf. Code, § 1342.6.) But because the formation of these groups required an agreement among competitors, the Legislature recognized that antitrust laws were serving as a disincentive to the formation of such groups due to providers' concerns that they would be "found guilty of committing per se antitrust violations." (Bus. & Prof. Code, § 16770, subd. (e).) To alleviate this problem, the Legislature enacted three virtually identical statutes stating its intent "that the formation of groups and combinations of providers and purchasing groups for the purpose of creating efficient-sized contracting units be recognized as the creation of a new product within the health care marketplace, and be subject, therefore, only to those antitrust prohibitions applicable to the conduct of other presumptively legitimate enterprises."[5] (Bus. & Prof. Code, § 16770, subd. (g); Health & Saf. Code, § 1342.6; see Ins. Code, § 10133.6.) For ease of reference, we refer to these statutes collectively as the immunity statute.

In addition to this portion of the statutory scheme designed to facilitate the development of PPO plans, the Legislature enacted statutes to provide regulatory oversight of the plans and "to promote the delivery and the quality of health and medical care to the people . . . who enroll in, or subscribe for the services rendered by, a health care service plan." (Health & Saf. Code,

---

[5] The Legislature's reference to the creation of a "new product" is in response to the United States Supreme Court's ruling in *Arizona v. Maricopa County Medical Society* (1982) 457 U.S. 332 [73 L.Ed.2d 48, 102 S.Ct. 2466], to which the Legislature cited in Business and Professions Code section 16770, subdivision (e). In *Maricopa*, the Supreme Court held that groups of physicians who agreed to maximum fee schedules for reimbursement by insurance companies committed per se antitrust violations. The Supreme Court rejected the provider groups' reliance on *Broadcast Music, Inc. v. CBS* (1979) 441 U.S. 1 [60 L.Ed.2d 1, 99 S.Ct. 1551] for the proposition that their fee schedules involved price fixing only in a literal sense and did not constitute illegal price fixing. The court in *Maricopa* explained that in *Broadcast Music*, the blanket license that was offered was an entirely new product that was different from the product an individual composer could offer, whereas the provider groups in *Maricopa* were offering the same product—medical services—but simply were offering them at a fixed price. (*Maricopa, supra*, 457 U.S. at pp. 355–357 [73 L.Ed.2d 48, 102 S.Ct. 2466].) By referring in the immunity statute to the provider groups as a "new product," the Legislature emphasized that the formation of those groups to offer services at fixed prices would not constitute illegal price fixing.

§ 1342.) To that end, the Legislature created the Department of Managed Health Care, which "has charge of the execution of the laws of this state relating to health care service plans and the health care service plan business including, but not limited to, those laws directing the department to ensure that health care service plans provide enrollees with access to quality health care services and protect and promote the interests of enrollees." (Health & Saf. Code, § 1341, subd. (a).) The Legislature also directed the Insurance Commissioner, in consultation with the Department of Managed Health Care, to promulgate regulations "designed to assure accessibility of provider services in a timely manner" to PPO plan subscribers in a cost efficient manner. (Ins. Code, § 10133.5, subd. (b).)[6] The Legislature further directed the Governor to convene a task force on health care service plans to research, among other things, how the changes in health care delivery have affected the health care economy and whether the goals of managed care (such as controlling costs and improving quality and access to care) are being satisfied. (Health & Saf. Code, § 1342.1.) Finally, the Legislature enacted Health and Safety Code section 1373.9, which requires insurers offering PPO plans to give "reasonable consideration" to proposals by providers wishing to contract to become preferred providers, unless the providers propose to serve a geographic area that is adequately served by the PPO plans' existing preferred providers.[7]

It is against the backdrop of all these statutes and regulations that we must analyze plaintiffs' claims.

### B. *Plaintiffs' Claims Evaluated Under the Legislative Scheme*

Plaintiffs contend that PTPN's geographic restrictions on membership, coupled with Blue Cross's designation of PTPN members as the exclusive preferred providers of physical therapy services, foreclose non-PTPN physical therapists from competing to provide services to Blue Cross subscribers. They argue that although the immunity statute authorizes the formation of provider networks, it does not allow those networks to violate the antitrust

---

[6] Those regulations are found in title 28 of the California Code of Regulations, and include detailed requirements related to patient accessibility to services and geographic accessibility standards. (See, e.g., Cal. Code Regs., tit. 28, §§ 1300.67.2, 1300.67.2.1.)

[7] The statute defines "reasonable consideration" as "consideration in good faith of the terms of proposals for affiliation prior to the time that contracts for alternative rates of payment are entered into or renewed. A plan may specify the terms and conditions of affiliation to assure cost efficiency, qualification of providers, appropriate utilization of services, accessibility, convenience to persons who would receive the provider's services, and consistency with the plan's basic method of operation, but shall not exclude providers because of their category of license." (Health & Saf. Code, § 1373.9, subd. (b)(1).)

laws—which prohibit group boycotts and territorial market allocations—while doing so. They also assert that even if the immunity statute immunized all activity in connection with the formation of provider networks, the conduct at issue is not conduct related to the formation of PTPN, but rather it is conduct related to the operation of the PTPN network and PTPN's contractual relationship with Blue Cross.

In examining whether the conduct alleged constitutes an unlawful restraint on competition that is not exempt from antitrust enforcement under the immunity statute, it is important to distinguish between the two markets in which plaintiffs compete with PTPN and/or its members. The first market involves competition to provide physical therapy services to patients, including Blue Cross PPO plan subscribers—a market in which plaintiffs compete with PTPN members. The second market involves the competition to become Blue Cross preferred providers—a market in which plaintiffs compete with PTPN itself (rather than its individual members). We examine each area of competition to determine if the complaint alleges a cognizable unlawful restraint.

### 1. *Competition to Provide Services to Blue Cross Subscribers*

The complaint alleges that, due to the exclusive contract between Blue Cross and PTPN, plaintiffs and other non-PTPN physical therapists cannot reasonably compete to provide physical therapy services to Blue Cross PPO plan subscribers. The reason: The subscribers are required to pay far more to receive services from a physical therapist who is not a preferred provider.

■ There is no doubt that the contractual relationship between Blue Cross and PTPN inhibits plaintiffs' ability to compete, at least on a price basis, because of the low out-of-pocket costs to patients who utilize the services of PTPN members.[8] But that competitive disadvantage is expressly authorized by statute. Insurance Code section 10133 allows an insurer to contract for alternative rates with any provider and offer the benefit of those alternative rates to their insureds. The antitrust laws cannot be applied to forbid that which another statute expressly allows. ■ (Cf. *Stafford v. L. A. etc. Retirement Board* (1954) 42 Cal.2d 795, 799 [270 P.2d 12] [statutes must be " 'construed with reference to the whole system of law of which [they are] a part so that all may be harmonized and have effect' "].)

---

[8] We note that a subscriber might be willing to pay the additional cost to be treated by a non-PTPN member if that physical therapist offered services that were sufficiently better or better suited for the subscriber. Thus, plaintiffs may still compete on the basis of quality or innovation.

Moreover, by choosing to subscribe to a PPO plan, the subscribers themselves impair the nonpreferred providers' ability to compete for their business. To the extent that the subscribers' choice to limit competition among providers might result in higher costs and/or decreased quality, the subscribers are protected by the statutory and regulatory scheme designed to ensure that PPO plan subscribers have adequate access to high quality and cost effective health care. (Bus. & Prof. Code, § 16770; Health & Saf. Code, §§ 1341, 1342, 1342.6, 1373.9; Ins. Code, §§ 10133.5, 10133.6; Cal. Code Regs., tit. 28, §§ 1300.51, 1300.67 et seq.)

2. *Competition to Become Preferred Providers*

██ The complaint does not allege that Blue Cross or PTPN have engaged in conduct that directly restrains plaintiffs from negotiating with Blue Cross to become preferred providers. Instead, the complaint alleges that plaintiffs are foreclosed from becoming preferred providers because Blue Cross and PTPN have agreed to make PTPN members the exclusive or virtually exclusive preferred providers for Blue Cross's PPO plan. But once again, that conduct is authorized by statute. Insurance Code section 10133 allows an insurer to contract with any provider to become a preferred provider, and Health and Safety Code section 1373.9 requires the insurer to consider proposals by other providers wishing to become preferred providers *only* if the existing preferred providers do not adequately serve the geographic area proposed to be served by the other providers. And once again, the consumers' interests are protected by the extensive regulatory oversight to ensure that each plan has sufficient preferred providers in the areas in which it operates to adequately serve those subscribers. (See, e.g., Cal. Code Regs., tit. 28, §§ 1300.51, 1300.67.2, 1300.67.2.1.) Thus, the simple allegation that an insurer has entered into an exclusive contract with a provider group does not describe conduct that violates the antitrust laws.

This is not to say there can never be an antitrust violation if one or more providers or provider groups use coercion, threats, or intimidation to convince an insurer to refuse to negotiate with other providers or provider groups. (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 268 [195 Cal.Rptr. 211].) But as the trial court found in this case, plaintiffs make no such allegation. In fact, it appears from the exhibit attached to the complaint that Blue Cross intended to negotiate with non-PTPN members who served areas in which PTPN did not have an adequate number of members, which prompted PTPN to modify its geographic restrictions to ensure adequate coverage.

Plaintiffs contend, however, that the exclusive contract between Blue Cross and PTPN unlawfully restrains competition because PTPN places geographic restrictions on its members. Thus, plaintiffs contend that PTPN and Blue Cross engage in a territorial market allocation that violates the Cartwright Act. Plaintiffs' contention fails because PTPN's imposition of geographic restrictions is expressly immunized by the immunity statute.

■ The immunity statute proclaims that combinations or groups of providers formed as "efficient-sized contracting units" are "a new product within the health care marketplace" and are subject "only to those antitrust prohibitions applicable to the conduct of other presumptively legitimate enterprises." (Bus. & Prof. Code, § 16770, subd. (g); Ins. Code, § 10133.6; Health & Saf. Code, § 1342.6.) In other words, the groups' conduct in forming efficient-sized contracting units is exempt from the antitrust laws, although their conduct in negotiating alternative rates of payment is subject to antitrust enforcement.[9] (See *Cianci v. Superior Court* (1985) 40 Cal.3d 903, 923, fn. 7 [221 Cal.Rptr. 575, 710 P.2d 375].)

In the present case, PTPN's imposition of geographic restrictions on its members is immunized because it is part of the formation of an efficient-sized contracting unit. The regulations governing PPO plans require Blue Cross (and other insurers) to contract alternative rates of payment with a sufficient number of preferred providers in all geographic areas in which they have subscribers to ensure there will be adequate access to health care services for their subscribers. (See, e.g., Cal. Code Regs., tit. 28, §§ 1300.51, 1300.67.2, 1300.67.2.1.) To create the most efficient-sized contracting unit, PTPN must include a sufficient number of providers to allow Blue Cross to meet the regulatory requirements (or to exceed those requirements, if Blue Cross so desires). At the same time, PTPN must limit its membership sufficiently to ensure a patient volume for each member that will provide an incentive for the members to reduce their rate of payment. The geographic restrictions PTPN imposes on its members thus must be viewed as conduct related to the formation of an efficient-sized contracting unit, and therefore PTPN is exempt from antitrust enforcement under the immunity statute for the imposition of those restrictions. PTPN's subsequent enforcement of its geographic restrictions and its modification of those restrictions in response to Blue Cross's need for additional providers also is excluded from antitrust enforcement

---

[9] For example, if two or more groups each formed contracting units and agreed that only one group would negotiate with each insurer, that conduct could be subject to antitrust enforcement. There is no such conduct alleged in this case.

under the immunity statute because it is conduct aimed at maintaining the efficient size of the contracting unit.[10]

### 3. *Liability Under the Unfair Competition Law*

In addition to alleging that PTPN's and Blue Cross's conduct violates the Cartwright Act, plaintiffs allege that conduct violates the unfair competition law. They argue on appeal that even if their Cartwright Act claim fails, they have stated an unfair competition claim because the conduct they allege violates the policy or spirit of the Cartwright Act and therefore is "unfair" under Business and Professions Code section 17200. They are incorrect.

 In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527], the Supreme Court discussed the scope of the unfair competition law: "Although the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Id.* at p. 182.)

As we have explained, the Legislature expressly authorized or exempted from antitrust enforcement the conduct alleged in this case. It is from the Legislature or the Department of Managed Health Care that plaintiffs must seek their desired remedy. The courts are not empowered to overrule the Legislature's judgment in these matters. Accordingly, we affirm the trial court's ruling granting PTPN's and Blue Cross's motions for judgment on the pleadings.

---

[10] In light of our holding that the immunity statute exempts PTPN's imposition of geographic restrictions on its members from antitrust enforcement, we need not address whether plaintiffs allege *antitrust* injury arising from those restrictions—i.e., whether the alleged territorial market allocation restrains competition in the relevant market, the negotiation to become a Blue Cross preferred provider. (See, e.g., *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 489 [50 L.Ed.2d 701, 97 S.Ct. 690] [antitrust plaintiff must establish "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"].)

## DISPOSITION

The judgment is affirmed. PTPN and Blue Cross shall recover their costs on appeal.

Epstein, P. J., and Manella, J., concurred.

A petition for a rehearing was denied April 10, 2007, and appellants' petition for review by the Supreme Court was denied July 18, 2007, S152370.