UNITED STATES of America, Plaintiff,

v.

ROSENDIN ELECTRIC, INC., C.V.E., Inc., Louis M. Rosendin, Robert K. Donnelly, and William O. Schafhirt, Defendants.

Nos. CR–87–20003–WAI, CR–87–20004–WAI.

United States District Court, N.D. California.

Sept. 9, 1987.

---

FINDINGS OF FACT AND
CONCLUSIONS OF LAW·

INGRAM, District Judge.

## PROCEDURAL BACKGROUND

1. On May 14, 1987, the above-entitled action was remanded by the Court of Appeals for the Ninth Circuit to this court to hold an evidentiary hearing "for the limited purpose of determining whether [the government] violated Fed.R.Crim.P. 6(d) or 6(e)." The evidentiary hearing having been held, the court now renders its Findings of Fact and Conclusions of Law.

2. On November 3, 1986, a one-count indictment was filed against the defendants, described briefly at Findings of Fact Numbers 1 to 6, alleging that they engaged in a combination and conspiracy by rigging bids in signals and lighting construction projects with various governmental entities and private developers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The bid-rigging action is case number CR–87–20004–WAI. [The federal grand jury investigation which led to the indictment in this case is hereinafter referred to as "the signals and lighting grand jury investigation."]

Joseph P. Russoniello, U.S. Atty., Robert Ward, Chief, Crim. Div., San Jose, Cal. by Christopher S. Crook, Joel S. Sanders, Mark D. Eibert, for plaintiff U.S.

James R. Schwartz, Deputy Atty. Gen., Dept. of Justice, San Francisco, Cal., for State of Cal.

Morrison & Foerster, San Francisco, Cal. by James J. Brosnahan, George Harris, for defendant Louis M. Rosendin.

Morgan, Ruby, Teter, Schofield, Franich & Fredkin, San Jose, Cal. by Allen Ruby, for defendant Rosendin Elec., Inc.

Nolan & Parnes, Palo Alto, Cal. by Thomas J. Nolan, for defendant Schafhirt.

Farella, Braun & Martel, San Francisco, Cal. by Daniel Bookin, for defendant Donnelly.

Irvine & Cooper, Palo Alto, Cal. by David L. Cooper, Penny A. Irvine, for defendant C.V.E., Inc.

3. On November 3, 1986, a one-count indictment was also filed against defendant Louis M. Rosendin, alleging that on November 13, 1984, Rosendin knowingly made false declarations before the federal grand jury in violation of 18 U.S.C. § 1623. The perjury action is case number CR–87–20003–WAI.

4. On November 18, 1986, Howard Electric, Inc., a California corporation with its principal place of business in San Jose, California, and Theodore Strotman, president and majority owner of Howard Electric, Inc., who had both been targets of the signals and lighting grand jury investigation, pled guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, for bid-rigging on signals and lighting construction projects. For a discussion of the dates of judgment and fines imposed, *see* Order *United States v. Rosendin, Inc.*, 122 F.R.D. 219, 220 & n. 1 (N.D.Cal.1987).

5. On March 30, 1987, the defendants moved to dismiss the indictment or, in the alternative, for an evidentiary hearing and discovery.

6. On April 27, 1987, after having considered the papers of all parties and argument presented in the oral hearing held on April 17, this court denied defendants' motion to dismiss the indictment or, in the alternative, for an order granting an evidentiary hearing and discovery. This court found that, after applying the harmless error rule under Fed.R.Crim.P. 52(a), as required under *United States v. Mechanik*, 475 U.S. 66, 72, 106 S.Ct. 938, 942–943, 89 L.Ed.2d 50, 57 (1986), the defendants had failed to show "that the probable cause on which the indictment was based was lacking when considered independent of the alleged grand jury violation." Order, at 3 (filed Apr. 27, 1987). The court left open the possibility of holding an evidentiary hearing after the trial.

7. On May 5, 1987, an appeal of this court's interlocutory order was taken by each of the defendants in this action.

8. Shortly thereafter, the United States moved to dismiss the appeals or, in the alternative, for summary affirmance of this court's April 27th order.

9. On May 14, 1987, the Court of Appeals for the Ninth Circuit consolidated each of the defendant's appeals, stayed the trial of this action which was originally scheduled for May 18, 1987, and remanded the consolidated action to this court to hold an evidentiary hearing to ascertain whether violations of the grand jury process under Fed.R.Crim.P. 6(d) or 6(e) were committed by the plaintiff the United States. The remand order directed this court "to make appropriate findings" and to forward such findings to the Court of Appeals for consideration of the United States' pending motion to dismiss the appeals, or in the alternative, for summary affirmance.

10. On May 18 and 26, 1987, organizational meetings were held by the court with all counsel to discuss the procedure to be followed in holding the evidentiary hearing and to set a briefing schedule for consideration of relevant motions.

11. On June 16, 1987, after having held a June 9th hearing, this court issued a written order on the motions of the United States and of six officials from the California Attorney General's office to quash the defendants' subpoenas for testimony and documents of twelve present and former federal and state government officials. In sum, the motions for testimony of high-ranking officials in the U.S. Department of Justice in Washington, D.C., who were not directly involved in this case, were denied, and the subpoenas for testimony were granted for those state witnesses who played a relevant role in the instant action. Order, at 8–9 (June 16, 1987).

12. This court also found that the defendants' request for a far-reaching inquiry into several areas was not directly relevant to "the Ninth Circuit mandate to conduct an evidentiary hearing 'limited' to the question of whether or not the government actually violated either Fed.R.Crim.P. 6(d) or 6(e) in the federal grand jury investigation that led to the indictment in *this* case." Order, at 6–7 (June 16, 1987) (emphasis in original). Numerous documents, including portions of the federal grand jury transcript, were ordered to be submitted for *in camera* review.

13. After reviewing more than sixty documents submitted between June 15th and 23rd by the United States and the California Department of Justice for *in camera* examination, this court ruled on June 30th, during the first day of the evidentiary hearing, that three sets of documents should be disclosed to the defendants: (1) "the Cross–Designation Memorandum," (Exhibit K), and described in Findings of Fact Numbers 22–23, (2) "the American Airlines Brief," (Exhibit Q), and described in Finding of Fact Number 25, and (3) "Kwong's December 8th Memorandum" and "Gruskin's December 16th Memorandum," (Exhibit L), described in Findings of Fact Numbers 55–64. *See* Order, 122 F.R.D. at 221–22; RT at 242. [Hereinafter citations to the Reporter's Transcript are cited "RT" and identify the witness testifying, where relevant.]

During the course of the evidentiary hearing, other documents originally submitted for *in camera* examination were released to the defendants, either upon a showing of their relevancy or upon no objection raised by the United States or California Department of Justice. These documents included: (1) the J. Paul McGrath letter (Exhibit P), described at Findings of Fact Numbers 17 and 19, RT 521–22; (2) two status report memoranda concerning conversations between H. Chester Horn and Sanford N. Gruskin after the return of the federal grand jury indictment, which included redaction of irrelevant and privileged matters (Exhibit O), RT 555, 557–58, 568–69; (3) Gary R. Spratling's handwritten outline used in the May 9, 1984 cross-designation meeting with representatives from the United States and California Departments of Justice, which was released with a redaction of irrelevant and privileged matters, RT 642–43, 645, 646, 650, 767–68; (4) the package of materials sent to State Attorneys General for their consideration for participating in the cross-designation program, RT 646, 650–51, 769–70; (5) two computer printouts (Exhibits 5 and 6), RT 767, 838, with a redaction of work-product matter to Exhibit 6, described at Findings of Fact Numbers 78–91; and (6) the cross-designation appointment papers, as filed by the state for *in camera* examination (Exhibit 8), which are entirely duplicative of those filed by stipulation under Joint Exhibit 7, with six exceptions, RT 820–21.

At the conclusion of the evidentiary hearing, the defendants had obtained most of the non grand jury documents submitted to the court for *in camera* review.

14. All original *in camera* submissions, including portions of the federal grand jury transcript, have been filed under seal. *See* RT 246.

15. The evidentiary hearing was conducted over four days, during which time the testimony of six witnesses was taken. All witnesses were sequestered. RT at 246, 248. On June 30, 1987, the first day of the evidentiary hearing, Owen Lee Kwong, Deputy Attorney General, Antitrust Section, California Department of Justice, testified.

On July 27, 1987, three witnesses were called: Kwong, Sanford N. Gruskin, Assistant Attorney General, Antitrust Section, California Department of Justice, and Gary R. Spratling, Chief of the San Francisco Field Office of the Antitrust Division, U.S. Department of Justice.

On July 28, 1987, three witnesses testified: Christopher S. Crook, lead attorney in this action for the United States with the Antitrust Division, San Francisco Office, and James Thomas Greene and H. Chester Horn, both Deputy Attorneys General, Antitrust Section, California Department of Justice, who were assigned to oversee the post-grand jury state civil action against the defendants.

After consideration of the parties' Letters of Memorandum submitted on August 12, 1987 (and filed under seal) on the question of whether the evidentiary hearing should be extended for testimony on the circumstances under which two computer printouts (Exhibits 5 and 6) were obtained by Horn, and after the court overruled the United States' objection to further testimony, RT 826, on August 25, 1987, Kwong and Crook testified further concerning issues about the genesis and transference of the computer printouts to Horn.

16. On July 16, 1987, the Ninth Circuit dismissed the appeal of Steiny & Company, Inc., one of the defendants named in the federal grand jury indictment and a California corporation with its principal place of business in Vallejo, California, after stipulation of the parties under Fed.R.App.P. 42(b) and after Steiny & Company pled guilty, on June 25th, to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, for bid-rigging on signals and lighting construction projects.

17. On July 21, 1987, this court found that it was not relevant for the defendants to inquire into Kwong's pre-grand jury activities because such inquiry, at this stage in the hearing, (1) was based upon a speculative statement made by Kwong, (2) there was no concrete proof of an ongoing conflict of interest between Kwong's pre-

grand jury and his grand jury activities, and, (3) after considering the conflict of interest cases cited by the defendants, the record did not factually support such grand jury abuse. Without permitting disclosure of the nature of Kwong's pre-grand jury activities, this court allowed the defendants to inquire into the rationale for Kwong's appointment. *See* Order, 122 F.R.D. at 230. Because of the court's disposition of this issue on relevancy grounds, the court did not address the privilege contentions raised by the United States. *See id.* at 225 n. 10.

18. After having conducted an *in camera* review of portions of the federal grand jury material, on July 21, 1987, this court ruled that none of the submitted federal grand jury materials would be released to the defendants because neither a "particularized need," under Fed.R.Crim.P. 6(e)(3)(C)(i), nor "grounds ... for a motion to dismiss the indictment because of matters occurring before the grand jury," under Fed.R.Crim.P. 6(e)(3)(C)(ii), had been adequately demonstrated. *See* Order, 122 F.R.D. at 222–25. An *in camera* review of the submitted federal grand jury materials revealed no violation of Fed.R.Crim.P. 6(d) or 6(e) and that in the three specific requested portions of the federal grand jury transcript, "the defendants' asserted need for disclosure ha[d] not outweighed the need for continued secrecy of the grand jury proceedings or overcome the presumption of regularity in the grand jury proceedings." *Id.* at 225. *See also* RT 242–44 (court discussing *in camera* review of three portions of grand jury transcript sought by defendants). The defendants had received portions of the grand jury materials which were disclosed pursuant to Fed.R.Crim.P. 16, the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

19. All *in camera* examinations and proceedings held during the course of the evidentiary hearing were conducted by the court in order to adequately safeguard federal grand jury matters, or matters contended to be grand jury matters, or government privileges asserted.

20. On July 28, 1987, the United States filed a Declaration and Claim of Privilege by the Acting Assistant Attorney General, Antitrust Division, U.S. Department of Justice, asserting the law enforcement evidentiary privilege to information concerning Kwong's work prior to the grand jury investigation and information which would reveal the investigatory techniques or methods in this prior investigation. RT 610, 675.

On August 25, 1987, the California Department of Justice filed a Declaration and Claim of Privilege by Chief Assistant Attorney General Andrea Ordin claiming the work-product and law enforcement evidentiary privileges.

These assertions of privilege complied with the three-pronged procedural, as well as substantive, requirements for proper invocation of these governmental privileges. RT 664 (court discussing three procedural requirements). *See e.g., United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953); *Black v. Sheraton Corp.,* 564 F.2d 531, 543 (D.C.Cir.1977) (law enforcement evidentiary privilege); *Lundy v. Interfirst Corp.,* 105 F.R.D. 499, 504 (D.D.C.1985) (work-product privilege).

21. On August 17 and 18, 1987, the United States and the defendants, respectively, filed Proposed Findings of Fact and Conclusions of Law, in compliance with this court's order. These filed documents were further supplemented by additional Proposed Findings of Fact and Conclusions of Law filed after the last day of the evidentiary hearing, on August 27th by the United States and on August 31st by the defendants.

During the evidentiary hearing, the court indicated that the parties' Proposed Findings of Fact and Conclusions of Law would best aid the court in considering the critical areas of evidence and law as well as highlight those matters deemed in dispute. RT 870 (remarks of the court). Consistent with this instruction and notice to the parties, in this court's Findings of Fact and Conclusions of Law, the court has not focused on subject matters not raised in the

Proposed Findings of Fact and Conclusions of Law filed by the parties.

## FINDINGS OF FACT

### The Defendants

1. Rosendin Electric, Inc., is a California corporation, and has its principal place of business in San Jose, California.

2. C.V.E., Inc., is a California corporation, and has its principal place of business in San Jose, California.

3. Louis M. Rosendin has served as an Executive Vice President of Rosendin Electric, Inc.

4. Robert K. Donnelly, has served as a Vice President of Steiny & Company, Inc., formally a defendant in this action.

5. William O. Schafhirt, has served as President of C.V.E., Inc.

6. Rosendin Electric, Inc., C.V.E., Inc., Louis M. Rosendin, Robert K. Donnelly, and William O. Schafhirt are hereinafter collectively referred to as "defendants."

### Key Government Officials

7. Owen Lee Kwong ("Kwong") was at all relevant times a Supervising Deputy Attorney General in charge of the Antitrust section in Los Angeles for the California Department of Justice. RT 249, 334–35 (Kwong); 505 (Gruskin).

8. Sanford N. Gruskin ("Gruskin") was at all relevant times the Assistant Attorney General in charge of the Antitrust Section for the California Department of Justice. RT 505, 515, 577 (Gruskin). He was, at all relevant times, the immediate supervisor of Kwong. RT 504–05, 515 (Gruskin).

9. Andrea Sheridan Ordin ("Ordin") was at all relevant times the Chief Assistant Attorney General of the Public Rights Division, California Department of Justice, which includes the Antitrust Section. RT 334–35 (Kwong); 516 (Gruskin).

10. H. Chester Horn, Jr. ("Horn") served in the California Attorney General's office from 1972 through 1981 and rejoined the office on December 15, 1986, as a Deputy Attorney General in the Antitrust Section of the California Department of Jus-

tice. RT 728 (Horn). Nearly six weeks after the return of the indictment by the federal grand jury, Horn was assigned the task of assessing and making a recommendation on whether a state civil action should be filed against the defendants named in the federal indictment. RT 729–32 (Horn). Horn is currently handling the state case filed against the defendants.

11. James Thomas Greene ("Greene") was at all relevant times the Supervising Deputy Attorney General in charge of the Antitrust Section in Sacramento for the California Department of Justice. RT 771 (Greene). In December 1986, Greene was asked by Gruskin to serve as the Acting Assistant Attorney General in Gruskin's place as the supervisor of Horn in the evaluation and processing of a civil antitrust case proposed to be filed against defendants in this matter. RT 514–15, 552 (Gruskin); 772, 784 (Greene).

12. Gary R. Spratling ("Spratling") is the Chief of the San Francisco Office of the Antitrust Division of the United States Department of Justice and at all relevant times served in a supervisory capacity over the instant action, and the incident federal grand jury investigation. RT 601 (Spratling).

13. Christopher S. Crook ("Crook") was at all relevant times an attorney with the San Francisco Office of the Antitrust Division of the United States Department of Justice and served as lead attorney in charge of the federal grand jury investigation incident to this case, and presently is the assigned lead attorney to the trial of this case. RT 678–79 (Crook).

14. Jonathan Howden ("Howden"), also an attorney with the San Francisco Office of the Antitrust Division of the United States Department of Justice, acted as lead attorney in the signals and lighting grand jury investigation in Crook's absence. RT 250 (Kwong); 678–79 (Crook).

### The Cross–Designation Program

15. Kwong and Gruskin were appointed under a U.S. Department of Justice Antitrust Division program, known as the

"Cross–Designation Program," as Special Assistants to the U.S. Attorney General pursuant to 28 U.S.C. § 515 [hereinafter Section 515 Special Assistant]. RT 249 (Kwong); 505–06 (Gruskin).

16. The cross-designation program was developed in 1984 as a program of cooperation and joint enforcement by state participants and the federal government in addressing mutual areas of interest in antitrust enforcement, including bid-rigging. RT 506–07, 575–76 (Gruskin); 603–04, 613 (Spratling); Declaration of Gary R. Spratling in Support of Government's Response to Defendants' Motion to Dismiss or for Evidentiary Hearing, ¶ 3, at 2 (filed Apr. 9, 1987).

17. The State of California considered the possibility of becoming involved in the cross-designation program through (1) a May 2, 1984 letter of J. Paul McGrath, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, to Gruskin, with a copy sent to California Attorney General John K. Van de Kamp (Exhibit P) [hereinafter "the McGrath letter"], and (2) in a May 9, 1984 meeting held in Sacramento in the California Attorney General's conference room office between representatives from the United States and California Departments of Justice. RT 520–21, 575, 578 (Gruskin); 605–13 (Spratling); 696 (Crook).

18. The purpose of the program was to (1) promote state and federal cooperation in antitrust enforcement, (2) to improve relations between the state attorneys general and the Antitrust Division of the U.S. Department of Justice, and (3) to strengthen federal antitrust enforcement in a period of decreasing budget and manpower resources. RT 506 (Gruskin); 603–04 (Spratling). It was not a purpose of the program to promote enforcement efforts which would include a majority of state civil cases. RT 604 (Spratling).

19. The May 2nd McGrath letter briefly described the program of "cross-designation" as an effort of joint enforcement where state prosecutors could be specially appointed as Special Assistants to the U.S. Attorney General pursuant to 28 U.S.C. § 515 or, in some instances, federal attorneys could work with state officials on criminal antitrust matters. The McGrath letter also noted that Section 515 Special Assistants would have to comply with the Fed.R.Crim.P. 6(e) prohibition against disclosure. A sample form letter of appointment accompanied the McGrath letter. *See* Letter of J. Paul McGrath to Sanford N. Gruskin (dated May 2, 1984) (Exhibit P); RT 521 (Gruskin).

20. During the May 9th meeting, Helmut F. Furth ("Furth"), Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, and Spratling provided a full description of how the cross-designation program was to work. RT 611–13, 656 (Spratling). Spratling discussed the advantages and disadvantages of the program. RT 652–54 (Spratling); Spratling's handwritten notes (sealed). Furth, *inter alia*, stated that a state attorney appointed as a Section 515 Special Assistant participating in the federal grand jury proceeding could work on a subsequent related civil matter but could not disclose grand jury matters to any third person. RT 523 (Gruskin). Furth's statement was based upon footnote 15 in *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 431 n.15, 103 S.Ct. 3133, 3141–3142 n.15, 77 L.Ed.2d 743, 757 n.15 (1983), where the Supreme Court expressly declined to address an "issue concerning continued use of grand jury materials in the civil phase of a dispute, by an attorney who himself conducted the criminal prosecution." *See* RT 614–15 (Spratling). The position articulated by Furth had been adopted as the legal position of the Antitrust Division, U.S. Department of Justice, and had been posited in some briefs filed by that division. RT 615 (Spratling). This position was not put forth as an advantage of the cross-designation program but was in response to a question by one of the state representatives. RT 614, 615–16, 654 (Spratling). Spratling did not tell the California officials that disqualification would result from participation in a state civil case but that they should assume disqualification would result from subsequent civil use of federal grand jury materials, given the uncertainty of the

law on this question. RT 618, 655 (Spratling). One of the disadvantages of the cross-designation program mentioned by Spratling at the May 9th meeting was that a cross-designee working on a federal grand jury investigation would be prohibited from disclosing grand jury developments to "anyone [not also serving as a cross-designee on the same case] in the State Attorney General's Office." RT 654 (Spratling). [The issue left open in footnote 15 of the *Sells Engineering* decision was addressed this past term by the Supreme Court in *United States v. John Doe, Inc. I,* 481 U.S. 102, 107 S.Ct. 1656, 95 L.Ed.2d 94 (1987).]

21. There was no discussion at this meeting of specific case assignments or matters which the federal grand jury was to investigate, RT 525–26, 538–39 (Gruskin); 637 (Spratling); 697 (Crook), or of whether an appointed Special Assistant would be identified before the grand jury as a state representative. RT 619–20 (Spratling).

### The Cross–Designation Memorandum

22. On May 11, 1984, Kwong sent a memorandum to Gruskin regarding "the consequences of the appearance and participation of a federally deputized state attorney before a federal grand jury" [hereinafter "the Cross–Designation Memorandum"]. (Exhibit K). This memorandum was written to explore open questions prior to any actual problems arising. RT 453 (Kwong).

23. After discussing relevant case law concerning the grand jury procedure and the application of Fed.R.Crim.P. 6(e), Kwong reached two primary conclusions in his memorandum. First, he noted that "it appears that information gathered before a federal grand jury, while a deputized attorney general, can not be used in a subsequent civil investigation or prosecution." Second, Kwong noted that, although the issue was not settled, "it is surmised that a deputized state attorney general would be disqualified from conducting a civil prosecution, absent some method that would safeguard from disclosure of the informa-

tion he received while before the grand jury." *See* Cross–Designation Memorandum, at 9–10 (Exhibit K).

24. Between May and November, 1984, Gruskin had a telephone conversation with Spratling concerning the possibility of subsequent involvement in a state civil action by a cross-designated state attorney who had worked on the grand jury investigation. RT 581 (Gruskin). Spratling told Gruskin that this issue involved "unchartered waters" and that the position of the Antitrust Division, U.S. Department of Justice was that subsequent participation was permissible as long as there was no disclosure to a third person. RT 522–23, 582 (Gruskin).

### The American Airlines Brief

25. On November 5, 1984, Spratling sent Gruskin a cover letter attaching an accompanying brief of the Antitrust Division, U.S. Department of Justice, dated September 6, 1983 in *United States v. American Airlines, Inc.,* No. CA 3–83–0325–D (N.D.Tex.1983) [hereinafter "the American Airlines Brief"]. (Exhibit Q); RT 583 (Gruskin). In enclosing the American Airlines Brief, Spratling's letter noted that the brief "states the [U.S. Department of Justice, Antitrust] Division's position regarding subsequent use of grand jury materials in a related civil case by attorneys who participated in the federal grand jury investigation."

26. From the point of view of the State of California, the purpose of the cross-designation program was to provide cooperation between the Antitrust Division of the United States Department of Justice and the Antitrust Section of the Office of the California Attorney General in the enforcement of antitrust laws on matters of mutual concern. The Office of the California Attorney General at all relevant times had jurisdiction and standing to bring an action for a violation of the California antitrust laws, both civil and criminal. The cross-designation program provided an opportunity for persons in the Antitrust Section of the Office of the California Attorney General to obtain training and experience in the pre-

sentation of an antitrust case to a grand jury, and in the conduct of the trial of a criminal antitrust case. RT 461 (Kwong); 506–07 (Gruskin). *See also* RT 652–53 (Spratling).

### Admonition To Seal Off Cross–Designees From Related State Actions

27. The federal officials involved in or with the signals and lighting grand jury investigation believed that Kwong and Gruskin, by virtue of their Section 515 Special Assistant appointments, should not be involved in any subsequent state civil action that could arise from the investigation, RT 466–67 (Kwong); 655 (Spratling); 692, 720 (Crook), and would be sealed off from any participation in any subsequent state action, which, if brought, would be handled by state attorneys with no knowledge of federal grand jury matters. RT 689–90, 691, 692, 707, 716–19, 723 (Crook).

### Condition To Comply With Rule 6(e)

28. By preliminary correspondence, letters of appointment, and oral discussions, both Kwong and Gruskin were advised and admonished with respect to their duty to abide by all restrictions applicable to attorneys in the Department of Justice against the disclosure to unauthorized persons of information obtained by them in the course of their work as Special Assistants and specifically with respect to their obligation to comply with the requirements of Fed.R. Crim.P. 6(e) regarding unauthorized disclosure of matters occurring before any federal grand jury. In fact, compliance with Fed.R.Crim.P. 6(e) was one of five conditions of appointment in the cross-designation of Kwong and Gruskin. *See e.g.,* Letters of Brian E. Meyers, Deputy Director, Office of Attorney Personnel Management, U.S. Department of Justice, to Gruskin and Kwong (dated Feb. 13, 1985 and Apr. 1, 1985) (Joint Exhibit 7 and Exhibit 8); RT 612, 654, 655 (Spratling); 654, 692 (Crook).

### Proscription Against Conflicts of Interest With State Duties

29. The correspondence to California Attorney General John K. Van de Kamp concerning the Section 515 Special Assistant appointments of Kwong and Gruskin contained directives to "ensure that" the state positions of Gruskin and Kwong did "not interfere with the proper and effective performance of [their] duties as Special Assistant[s] to the United States Attorney General and that [they] avoid [ ] all conflict of interest or appearance of conflict of interest." *See* Appointment Letters (Joint Exhibit 7; Exhibit 8).

### Operation Of Cross–Designation Program In This Case

30. The cross-designation program, as applied to the facts of this action, was intended to operate within the context and strictures of Fed.R.Crim.P. 6(e). RT 624, 626–27 (Spratling).

31. The cross-designation program, as applied to the facts of this action, was not intended to be used for the purpose of evading the holding in *Illinois v. Abbott & Associates, Inc.,* 460 U.S. 557, 103 S.Ct. 1356, 75 L.Ed.2d 281 (1983), where the Supreme Court held that a state did not have a statutory right of access under section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b), to grand jury materials and could only obtain disclosure by meeting the requirements of Fed.R.Crim.P. 6(e)(3). In fact, this decision by the Supreme Court was not discussed at the May 9, 1984 meeting in Sacramento. RT 540 (Gruskin); 642 (Spratling).

32. The cross-designation program, as applied to the facts of this action, was not intended to be used for disclosure of federal grand jury matters to state attorneys for use in a subsequent state civil action or to aid the California Department of Justice in bringing a state damage action. RT 612, 656, 657 (Spratling); The McGrath Letter (Exhibit P).

33. There is no evidence that the cross-designation program, as applied to the facts of this action, was used for the purpose of disclosing federal grand jury matters to state attorneys except to Special Assistants to the United States Attorney General to whom disclosure was made only for the purpose of enforcing the federal

criminal law. RT 252–55 (Kwong); 509 (Gruskin); 656 (Spratling); The Cross–Designation Memorandum (Exhibit K); Gruskin's December 16th Memorandum and Kwong's December 8th Memorandum (Exhibit L).

### Section 515 Special Assistant Appointments

34. Kwong was first duly appointed as a Section 515 Special Assistant on April 1, 1985, and executed the oath of office for this appointment on April 18, 1985. Gruskin's appointment commenced on February 13, 1985, and he executed the oath of office on February 21, 1985. Both Kwong and Gruskin currently hold these appointments pursuant to the cross-designation program. *See* Appointment papers in Joint Exhibit 7 and Exhibit 8; RT 255, 256, 278, 297, 469, 827–28 (Kwong); 519, 558 (Gruskin).

35. Gruskin was appointed as a Section 515 Special Assistant because of his supervisory role over Kwong and to remain aware of the operation of the cross-designation program. RT 302 (Kwong); 505–06 (Gruskin); 690 (Crook).

36. Gruskin and Kwong first learned of the signals and lighting grand jury investigation, which they became involved with, in the fall of 1985, subsequent to the May 9, 1984 cross-designation meeting and to their appointments as Section 515 Special Assistants. RT 578 (Gruskin), 641 (Spratling). Kwong did not select which federal grand jury investigation he would become associated with. RT 462 (Kwong).

### No Appearance By Gruskin Before The Grand Jury

37. Following his appointment and qualification as a Section 515 Special Assistant to the United States Attorney General, Gruskin never appeared before the federal grand jury which ultimately returned the indictment in the instant case. RT 303 (Kwong); 508, 509, 518–19 (Gruskin); 690, 691 (Crook). Gruskin played no participatory role in decisions concerning the management of the proceedings before the grand jury, RT 508–09 (Gruskin), and he examined no grand jury documents. RT 518–19, 529 (Gruskin).

### Appearance By Kwong Before The Grand Jury

38. Kwong was treated as a beginning junior member of the federal grand jury investigation team. RT 250 (Kwong); 679 (Crook). Kwong's subordinate role and participation in the decision-making process in the grand jury investigation resulted from his limited prior grand jury experience, RT 301 (Kwong), and from the fact that he was based in Los Angeles while the grand jury investigation was being conducted in Northern California. RT 681 (Crook).

39. Kwong, who was present during most of the grand jury sessions and heard most of the witnesses, RT 348, 374 (Kwong), was never identified before the grand jury as anyone other than either a Special Assistant, or as one of several attorneys with the U.S. Justice Department, or as assisting with the grand jury investigation. No identification of Kwong was made referring to his position or role with the State of California or associating Kwong in any manner with the State of California or the California Department of Justice. RT 280 (Kwong); Grand Jury Transcripts.

40. All decisions with respect to the management of the proceedings of the grand jury and with respect to the recommendations made by counsel to the grand jury and with respect to advices given by counsel to the grand jury were made by Crook, or in his absence by Howden. RT 249–50 (Kwong); 679, 681–83 (Crook).

41. Kwong was not a participant in any decisions with respect to grand jury management and/or recommendations. RT 251–52 (Kwong); 681–83 (Crook). A fair examination of the evidentiary hearing record shows that Kwong, as a junior member of the grand jury staff, followed the direction of his superiors (either Crook, or, in his absence, Howden), and did not use the grand jury to obtain irrelevant or impermissible evidence or to introduce irrele-

vant or impermissible factors in the proceeding.

42. Kwong examined two witnesses before the grand jury. Grand Jury Transcripts. Crook, as lead attorney, selected the witnesses to be examined by Kwong, a decision based upon Kwong's limited grand jury experience and on the expectation that the witnesses would not be difficult or have much information. RT 680 (Crook). At no time did Kwong request the opportunity to examine any particular witness. RT 250 (Kwong); 680–81 (Crook).

43. As a Section 515 Special Assistant, Kwong was authorized to conduct any kind of legal proceeding which United States Attorneys are authorized to conduct, including grand jury proceedings. *See* 28 U.S.C. § 515; Letter of Authorization to Appear Before Grand Jury from Mark Leddy, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, to Kwong (dated Jan. 16, 1986) in Joint Exhibit 7 and Exhibit 8; RT 489–90 (court taking judicial notice of letter of authorization). Kwong reviewed documents subpoenaed by the grand jury, and performed general duties as a member of the grand jury investigation. RT 250, 375–77, 380 (Kwong); 680 (Crook); Letters of Brian E. Meyers, Deputy Director, Office of Attorney Personnel Management, U.S. Department of Justice, to Kwong and Gruskin (dated Feb. 13, 1985; Apr. 1, 1985) (Joint Exhibit 7 and Exhibit 8).

44. Kwong did not participate in the selection of persons to be subpoenaed as witnesses by the grand jury, or the decision as to which persons were regarded as targets, or as to the determination of investigative leads, or as to whether or not to recommend an indictment, or in the drafting of the allegations of the indictment. RT 250–52 (Kwong); 681–83 (Crook).

45. During the course of the grand jury investigation, Kwong orally reported to Gruskin on the status of the grand jury, although it was not on a regular basis. RT 489 (Kwong); 526–27, 529, 552–53, 573 (Gruskin).

46. Throughout the time that Kwong worked on the federal grand jury investigation he continued to receive his full salary from the State of California, and continued to maintain his office in the State Attorney General's Office in Los Angeles. He received no compensation from the federal government. Necessary travel expenses and living expenses incurred by Kwong incident to his federal grand jury service were reimbursed by the State of California. Letter from Brian E. Meyers, Deputy Director, Office of Attorney Personnel Management, U.S. Department of Justice, to Kwong (dated Apr. 1, 1985) (Joint Exhibit 7; Exhibit 8); RT 379 (Kwong).

### *Kwong's Locked Los Angeles Office*

47. During the federal grand jury investigation, Kwong personally transported and shipped copies of documents concerning the grand jury investigation to a locked office next to his Los Angeles office. RT 254–55, 304–05, 311 (Kwong). Access to the locked office was limited to Kwong and Gruskin, who were the only two individuals with keys since the office was created. RT 254, 308–09, 385. Kwong has always been present when others have been in the locked room. RT 383 (while attorneys were watching a basketball game on TV), 384–85 (while telephone, inventory, and maintenance individuals were present), 735–36, 761 (for ten to fifteen seconds while Kwong gave Cal Trans documents to Horn) (Kwong).

48. No court order was sought or obtained with regard to the transportation of the copied documents which Kwong brought to his office in Los Angeles. However, because Kwong is an "attorney for the government," within the meaning of Fed.R.Crim.P. 6(e)(3)(A)(i), no court order was necessary.

49. The documents are presently in Kwong's Los Angeles office in the Office of the State Attorney General. RT 253, 254, 309 (Kwong).

50. Gruskin has not seen the grand jury-related documents in the locked room, RT 519 (Gruskin), and Crook was aware that Kwong had taken some documents to

Los Angeles in a "secure place" to prepare for witness examination. RT 723 (Crook).

51. The documents kept in the locked office included copies, but no originals, of subpoenaed and other documents, which Kwong did not believe were all protected under Fed.R.Crim.P. 6(e). RT 305, 382 (Kwong). Notwithstanding Kwong's belief on whether these documents were Rule 6(e) material, Kwong testified that he treated all of the documents as if they required Rule 6(e) protection. RT 305–06, 491–92 (Kwong).

52. The documents transported by Kwong to his Los Angeles office were used by him to prepare for the questioning of witnesses before the federal grand jury. RT 254 (Kwong).

### Decision to Seal Off Kwong and Gruskin From Any State Civil Action

53. The evidence shows that after the return of the indictment, because of some open questions under current law, Kwong and Gruskin discussed whether a conflict of interest might result from their Section 515 Special Assistant appointments and subsequent involvement in a state civil suit against the defendants named in the indictment, RT 468–69 (Kwong), and whether they could participate in a subsequent state civil action without violating Fed.R.Crim.P. 6(e) as a result of their involvement with the federal signals and lighting grand jury investigation. RT 265, 472–73 (Kwong); The Cross–Designation Memorandum (Exhibit K); Gruskin's December 16th Memorandum and Kwong's December 8th Memorandum (Exhibit L).

54. Ultimately, however, the more cautious path to seal off Kwong and Gruskin from any participation in any possible state civil action was followed because of the uncertainty under existing law. RT at 470–73, 491 (Kwong); 508, 511, 512–15 (Gruskin); 733 (Greene). Kwong and Gruskin were taken out of the approval chain for any state civil action related to the signals and lighting federal grand jury investigation and separate lines of authority were created. RT 588, 594 (Gruskin). Separate attorneys were assigned the task of determining whether a state civil action should be filed. RT 480 (Kwong); 528 (Gruskin). This independant evaluation was to be made without consideration of any grand jury materials and based upon an investigation of public information. RT 473 (Kwong). There is still no plan for Section 515 Special Assistants Kwong and Gruskin to work on a civil case related to the subject of the grand jury investigation. RT 511–12 (Gruskin).

### Kwong's December 8th Memorandum

55. On December 8, 1986, Kwong wrote a memorandum to Gruskin in which he reviewed decisions relating to the application of Fed.R.Crim.P. 6(e) to participation in a civil action by a cross-designated State Deputy Attorney General who participated in a federal grand jury investigation [hereinafter "Kwong's December 8th memorandum"]. Kwong concluded that the safest course would be that such cross-designated attorneys not participate in any subsequent civil case. Kwong's December 8th Memorandum (Exhibit L).

56. In his memorandum of December 8, 1986, Kwong recommended the immediate filing of a civil case based upon public information and information contained in the indictment by the State of California. Kwong's December 8th Memorandum (Exhibit L).

57. Kwong's December 8th memorandum also noted that the federal grand jury had been convened in late 1985, that state attorneys had been cross-designated to serve on the investigation, and that the indictment was returned "[a]fter fourteen months of reviewing industry documents and taking testimony from industry witnesses."

58. Kwong relied upon public information available at the time in authoring the December 8th memorandum. RT 485–87, 490–91 (Kwong).

59. Kwong testified that his recommendation with respect to the filing of the civil action in his memorandum of December 8, 1986, against all defendants in the criminal case "could have" been influenced by the

evidence that Kwong heard in the grand jury. RT 348–49 (Kwong).

60. Kwong testified that his knowledge that the federal grand jury spent time reviewing industry documents "may have been" based upon his work with the grand jury investigation. RT 487 (Kwong).

*Gruskin's December 16th Memorandum*

61. On December 16, 1986, Gruskin wrote a memorandum to Ordin [hereinafter "Gruskin's December 16th memorandum"] enclosing Kwong's December 8th memorandum, in which Gruskin made the statement that there was "a substantial statute of limitations issue" involved in any civil case to be filed by the State of California and that such a civil case should be instituted soon. Gruskin also expressed the view that "in an abundance of caution" and subject to Ordin's approval neither Kwong nor Gruskin should be involved in such a civil case "at this time." Gruskin's December 16th Memorandum (Exhibit L). This conclusion to seal off Kwong and Gruskin from any involvement in any subsequent state action was ultimately adopted by the California Department of Justice. RT 491 (Kwong); 513 (Gruskin).

62. Gruskin relied upon public information available at the time in authoring the December 16th memorandum. RT 512–14, 533 (Gruskin).

63. Paragraph 9 of the Indictment on file herein alleges as follows:

Beginning at least as early as 1968, and continuing thereafter until at least sometime in 1982, the exact dates being unknown to the grand jury, the defendants and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the above described interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

64. The statement in Gruskin's December 16th memorandum, to the effect that "there is a substantial statute of limitations issue," was based upon the allegations of the Indictment. RT 512, 517, 532–33 (Gruskin); Indictment ¶ 9.

*Independent Evaluation of Whether to File A State Civil Action*

65. In the middle of December 1986, some six weeks after the return of the federal grand jury indictment, Horn and Greene were assigned the task of independently evaluating whether or not the State of California should file a civil suit based on the allegations of the instant indictment, and, in the event such a suit were filed, to try the case.

66. Neither Horn nor Greene were ever involved in the instant federal grand jury investigation. RT 471 (Kwong); 513–15 (Gruskin); 772–73 (Greene); 732, 759, 760 (Horn).

67. For the purposes of supervising the evaluation and the trial of the California civil case, Greene, the Supervising Deputy Attorney General in charge of the Antitrust Section in Sacramento, was designated to act as Assistant Attorney General over the state civil action in the place of Gruskin, and a change of supervision was established which deliberately by-passed both Kwong and Gruskin. RT 471 (Kwong); 514–15, 528, 588 (Gruskin); 732, 759, 760 (Horn); 772–73, 781–82 787 (Greene). The non-involvement of Kwong and Gruskin in a possible state civil action represented a departure from regular procedure. RT 588–90, 594 (Gruskin); 760 (Horn).

68. On December 15, 1986, the first day Horn rejoined the California Department of Justice, *see* Finding of Fact Number 10, Horn met with Kwong and Gruskin to discuss his new assignments, including the task to evaluate whether a state civil action should be brought against the defendants named in the indictment. RT 729–32 (Horn).

69. On December 15, 1986, Horn was given a copy of Kwong's December 8th memorandum, but did not receive Gruskin's December 16th memorandum at that time. RT 729, 731 (Horn).

70. As noted in the December 16th memorandum, Gruskin assigned Chet Horn the "task of preparing a civil complaint and AG approval package." So as not to vio-

late the Fed.R.Crim.P. 6(e) prohibition against disclosure, Horn was to assess this matter based upon public information or information to be derived without requiring disclosure of the federal grand jury proceedings. RT 513–14 (Gruskin).

71. During the evidentiary hearing, Kwong testified that the December 15, 1986 meeting with Gruskin and Horn involved the "transfer" of the possible state case to Horn and Greene. RT 470, 471, 497 (Kwong). Upon further questioning from the court, RT 497, Kwong testified that consideration of a possible state case had been made by Kwong and Gruskin "only to the extent" reflected in Kwong's December 8th Memorandum. (Exhibit L). *See also* RT 324–25 (Kwong).

72. Despite consideration of open legal questions concerning subsequent involvement in a related state action by a cross-designated Section 515 Special Assistant who had worked on a federal grand jury investigation, (Exhibit L), there was no actual involvement or supervision by Kwong or Gruskin in a state civil case following the return of the indictment. Upon the conclusion that Kwong and Gruskin could not participate in a state civil action, the assessment of whether a state civil suit could be brought was assigned to Horn and Greene, who had no involvement with the signals and lighting grand jury investigation.

73. Neither Kwong nor Gruskin have worked on, or participated in the California Department of Justice's decision to bring, or supervised the civil matter filed by the State of California. RT 252–53 (Kwong); 511, 515, 547, 594 (Gruskin). At least as of December 8, 1986, no witnesses were interviewed concerning a possible state civil action. RT 532 (Gruskin).

74. After conducting an assessment on the matter, Horn and Greene ultimately recommended that a civil action be filed. RT 742 (Horn); 781–82 (Greene).

75. A fair reading of the evidence does not show that Gruskin or Kwong, by virtue of their supervisory positions or familiarity with the federal grand jury proceedings, exercised an influence over the recommendation of Horn and Greene that a state civil action be filed. RT 732, 743–44, 745, 747–48, 759–60 (Horn); 783–87 (Greene).

76. Horn could not have relied upon the reference in Gruskin's December 16th memorandum (Exhibit L) to "a substantial statute of limitations issue" because, in Horn's analysis, Gruskin's conclusion was incorrect. RT 760 (Horn).

77. On February 9, 1987, the State of California filed a civil complaint alleging violations of the California Cartwright Act, Cal.Bus. & Prof. Code § 16700 *et seq.*, and based on the allegations of the indictment in this case seeking damages from defendants in this case. (Exhibit S); RT 744, 747 (Horn). Similar suits were filed in the above-entitled court against said defendants by the City of San Jose on January 21, 1987, and by the City of Santa Cruz on January 22, 1987. Exhibit A; *San Jose v. Howard Electric, Inc.*, No. C–87–20032–WAI; *City of Santa Cruz v. Rosendin Electric, Inc.*, No. C–87–20037–WAI.

*Exhibits 5 & 6*

78. Exhibit 5, which is a computer printout from the Federal Highway Administration and may have been generated in 1987, RT 863, 866 (Crook), was seen for the first time by Kwong and Crook during the evidentiary hearing in August. (Exhibit 5); RT 832–33 (Kwong); 863–64 (Crook).

79. Exhibit 5 was in no way used during, derived from, or connected with the signals and lighting grand jury investigation. Exhibit 5 was used for no direct or collateral purpose in the federal grand jury proceedings. RT 833 (Kwong); 864 (Crook).

80. Exhibit 6, with a print date of December 17, 1986, Rt 880 (Kwong), is a computer printout from the California Department of Transportation ("CalTrans"), based on public information concerning various contracts put out to bid by government agencies during 1977 to 1982 and which was compiled in 1983 and 1984 before the grand jury investigation commenced. (Exhibit 6); RT 734, 751, 755–57 (Horn); 725 (Crook).

81. Neither Exhibit 5 nor Exhibit 6 were presented to the federal grand jury. RT 686–87 (Crook).

82. Exhibit 6 had two prior forms, all based upon the same 1983 or 1984 Cal-Trans database: (1) Exhibit 6 and (2) a predecessor [hereinafter "predecessor printout"], which was identical to Exhibit 6 before the court, were condensed versions of (3) a more bulky printout and format, requested by Crook in 1983 or 1984, and which was not requested for use in connection with the federal grand jury. RT 859–60 (Crook).

83. Both Exhibit 6 and the predecessor printout were obtained by Kwong at the behest of Crook. RT 834–39 (Kwong). In early 1986, Crook directed Kwong to obtain a copy of the predecessor printout to Exhibit 6. Following this instruction, Kwong requested the document from CalTrans. RT 836–37, 839 (Kwong); 852 (Crook). In late 1986, Crook misplaced his copy of the predecessor printout and asked Kwong for another copy. Kwong could not locate his copy and requested a reprint, which is currently before the court as Exhibit 6, and which contains the print date of December 17, 1986. RT 834 (Kwong); 858, 877 (Crook).

84. Kwong put his copy of the predecessor printout in the locked room in his Los Angeles office. RT 844 (Kwong).

85. The information in Exhibit 6 was provided voluntarily by CalTrans and was not obtained through the use of a federal grand jury subpoena or otherwise through the process of the grand jury.

86. The database for Exhibit 6, formulated in 1983 or 1984, was based only upon contracts let between 1977 and 1982. RT 869 (Crook); 882 (Kwong).

87. Exhibit 6 lists public contracts won by the four allegedly conspiring defendant companies during the period of 1977 to 1982 and which compiled information about these jobs, including: (1) the bids made by the four companies on the jobs; (2) the difference between each bid and the winning bid; (3) the percentage differential between each bid and the winning bid; and

(4) the percentage differential of each bid from the estimate.

88. Crook developed the format used in Exhibit 6 in 1983 or 1984, prior to the signals and lighting grand jury investigation. RT 855 (Crook).

89. Crook's purpose in obtaining Exhibit 6 was to double check the quality (or completeness) of document submissions which the federal grand jury was receiving pursuant to subpoena from some of the companies involved in the instant case. RT 856, 857, 871–72 (Crook).

90. Kwong gave Horn documents from CalTrans after the December 15, 1986 meeting, when Horn rejoined the California Department of Justice, and perhaps some time after the December 17th printout date on Exhibit 6, which were obtained from the locked room in Kwong's Los Angeles office. These documents consisted of certain Cal-Trans contracts and may have included Exhibit 6. RT 734 (Horn); 847–48, 883 (Kwong). Kwong did not tell Horn what to do with these documents when these documents were transferred. RT 735 (Horn); 847, 882–83 (Kwong).

91. Kwong has no recollection of having given Exhibit 6 to Horn, but may have done so. RT 845–46, 848, 880 (Kwong).

### CalTrans Contracts

92. Kwong gave to Horn certain contracts that he had previously obtained from the California Department of Transportation. RT 499–500, 830, 845 (Kwong); 734–36, 751, 757, 761 (Horn); Finding of Fact Number 90.

93. Kwong had requested some CalTrans contracts during his work on the signals and lighting grand jury investigation. RT 502 (Kwong). Kwong had reviewed the contracts and extracted certain materials from them. RT 501 (Kwong).

### Newspaper Articles

94. On December 19, 1986, Kwong was quoted in a newspaper article as saying, *inter alia:* (1) "[B]ased on the allegations set forth in the indictment, government agencies may have been overcharged;" (2)

"We are reviewing the matter ... but a decision has not been made as to whether we will file a case or not;" and (3) "In cases like this, Kwong said, proving something one way or another is done through 'discovery.' 'It's a lot of hard work ... there's usually a trail. There are things that are said. There are memos that are written.'" RT 277, 290–95 (Kwong); "Collishaw Faces FPPC Investigation," American, Dec. 19, 1986, at 1. (Exhibit J).

95. Kwong's statements to the American reporter were based on Kwong's experience as an antitrust attorney on other matters. RT 292, 295 (Kwong). Kwong's statement concerning "memos" did not refer to any particular memoranda in existence at the time of the statement. RT 295 (Kwong).

96. Paragraph 12(a) of the Indictment on file herein provides:

The aforesaid combination and conspiracy had the following effects, among others: (a) prices for signals and lighting construction were fixed, maintained and established at artificial and non-competitive levels;

97. On February 10, 1987, Horn was quoted as saying to a newspaper reporter, in substance, that the defendants' bid-rigging was uncovered by a federal grand jury, which he believed was convened in 1984. "Electrical contractors sued in bid-rigging," Contra Costa Times, Feb. 10, 1987, at 4A (Exhibit A). The source of Horn's information for this statement was another newspaper reporter. RT 749 (Horn). Kwong did not know on what information Horn's statements were based. RT 267, 269–70 (Kwong).

98. Horn was also quoted as saying to a newspaper reporter, in substance, that the information on which the indictment was based came from an individual who claimed he was fired because he refused to reinstitute the price fixing conspiracy. The sources of Horn's information for this statement were several newspaper reporters and a private attorney. RT 750 (Horn).

### The Issue of Disclosure

99. The attorneys who had access to federal grand jury information exercised care to insure that there would be no improper disclosure of matters occurring before the grand jury. RT 254–55, 385 (Kwong); 692 (Crook); The McGrath Letter (Exhibit P).

100. Gruskin never saw or possessed any federal grand jury transcripts, digests of grand jury transcripts, documents subpoenaed by the grand jury, or notes from grand jury sessions, and did not, and could not have disclosed such documents. RT 509, 518–19 (Gruskin).

101. *Prior* to the return of the federal grand jury indictment, Kwong did not disclose to anyone from the state any grand jury transcripts, digests of grand jury transcripts, documents subpoenaed by the grand jury, or notes from grand jury sessions. RT 252–55, 491–92 (Kwong).

102. *Prior* to the return of the federal grand jury indictment, there were *no* disclosures of matters occurring before the grand jury to Horn, Greene, or anyone else from the state, except between Kwong and Gruskin. RT 252–55 (Kwong); *Id.,* 509 (Gruskin); *Id.,* 683 (Crook).

103. There was no "disclosure," within the meaning of Fed.R.Crim.P. 6(e), in either Kwong's December 8th memorandum or Gruskin's December 16th memorandum. *See e.g., United States v. John Doe, Inc. I,* 481 U.S. 102, 108–11, 110 n. 6, 107 S.Ct. 1656, 1660–62, 1661 n. 6, 95 L.Ed.2d 94 105–07 & 106 n. 6 (1987). (Exhibit L.)

104. The comments made to reporters by Kwong and Horn did not disclose matters occurring before the federal grand jury.

### The Issue Of Grand Jury Manipulation

105. In making decisions with respect to the management of the proceedings before the grand jury and with respect to recommendations and advices given to the grand jury, Crook did not consider the interest, if any, of the State of California in the proceedings as a factor upon which decisions were made. RT 681, 682, 683 (Crook).

106. A fair examination of the grand jury transcripts does not disclose any matter involving Kwong's participation which could be characterized as demonstrating any interest on his part in aiding the State of California in the undertaking of any legal matter, whether civil or criminal, nor any other activity not in the interest of the purpose for which the grand jury was impaneled. Grand Jury Transcript.

107. In appearing before the grand jury, Kwong considered that he was representing the interest of the United States Department of Justice. RT 252 (Kwong).

108. The evidence does not reveal that Kwong was ever assigned to participate in any tag-along civil case to be filed by the State of California.

109. The California Attorney General's Antitrust Section did not contemplate utilizing evidence gathered by a grand jury and known to cross-designees in a state civil case without complying with the requirements of Fed.R.Crim.P. 6(d) and 6(e). RT 507 (Gruskin).

110. At the time of the cross-designation of Kwong and his participation in the grand jury investigation, his superior Gruskin was of the view that Kwong should not be assigned to do any work on any tag-along civil case which might be filed by the State of California. RT 507-08 (Gruskin).

111. Kwong denied, under oath, that in participating in the federal grand jury in the instant case he had a purpose of assisting the State of California in a civil damage action. RT 252 (Kwong).

112. Kwong stated under oath that he did not in any way participate in the decision to file a civil action on behalf of the State of California. RT 253 (Kwong).

113. The federal grand jury was not used for the purpose of furthering the interests of the California Department of Justice or the State of California. RT 250-52, 255, 474 (Kwong); 681-82 (Crook).

114. The federal grand jury was not used to gather documents for the California Department of Justice or the State of California to use in a civil action. RT 252-53, 255 (Kwong).

115. The concerns reflected in decisional law over the possibilities for abuse in the disclosure of grand jury materials for civil use, *see United States v. Sells Engineering, Inc.*, 463 U.S. 418, 431-35, 103 S.Ct. 3133, 3141-3144, 77 L.Ed.2d 743, 756-59 (1983); *John Doe, Inc. I*, 481 U.S. at 113-16, 107 S.Ct. at 1663-64, 95 L.Ed.2d at 109-10 (applying the three *Sells Engineering* factors), have not been evidenced in this case. Kwong, as a junior member of the grand jury investigation team, played a limited role in the grand jury proceedings, only interviewing two witnesses and exercising no control over the direction of grand jury investigation.

116. The cases discussing the manipulation issue have held that there is no government error where "[t]here is no finding that the grand jury proceeding was used as a shortcut to goals otherwise barred or more difficult to reach." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077, 1082 (1958). *See, e.g., United States v. Claiborne*, 765 F.2d 784, 796 (9th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1636, 90 L.Ed.2d 182 (1986) (noting that agents assisting the prosecution as government personnel under Fed.R.Crim.P. 6(e)(3)(A)(ii) did not seek "access to the grand jury's materials for purely civil purposes"). *Accord Sells Engineering*, 463 U.S. at 434 n. 19, 103 S.Ct. at 3143 n. 19, 77 L.Ed.2d at 759 n. 19 (noting that the *Procter & Gamble* decision was a "recognition that civil use of properly created grand jury materials is not per se illegal").

There has been no demonstration in this case that the federal grand jury machinery has been used with the objective cf attaining non-criminal ends. *Cf. Procter & Gamble*, 356 U.S. at 683, 78 S.Ct. at 986-987, 2 L.Ed.2d at 1082 (concern raised, but no finding made, about the prosecution "using criminal procedures to elicit evidence in a civil case"); *Sells Engineering*, 463 U.S. at 432, 103 S.Ct. at 3142, 77 L.Ed. 2d at 758 (noting in dictum that the "use of grand jury proceedings to elicit evidence for use in a civil case is improper per se").

## CONCLUSIONS OF LAW

■ 1. Neither Kwong nor Gruskin had a disqualifying, ongoing conflict of interest by reason of their state employment and cross designation as Special Assistants to the Attorney General of the United States which disabled them from performing assigned functions pursuant to 28 U.S.C. § 515(a), or which constituted a violation of Fed.R.Crim.P. 6(d). *See United States v. Troutman*, 814 F.2d 1428 (10th Cir.1987); *United States v. Reece*, 614 F.2d 1259 (10th Cir.1980); *United States v. Wencke*, 604 F.2d 607 (9th Cir.1979); *In re Perlin*, 589 F.2d 260 (7th Cir.1978); *United States v. Dondich*, 460 F.Supp. 849 (N.D.Cal.1978). *See also United States v. Birdman*, 602 F.2d 547 (3rd Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). *See generally In re April 1977 Grand Jury Subpoenas: General Motors Corp. v. United States*, 584 F.2d 1366, 1371 (6th Cir.1978) (Edwards, J., and Lively, J., concurring), *cert. denied sub nom., General Motors Corp. v. United States*, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979). Not only is there is no disqualifying, ongoing conflict of interest on the facts of this case, but the egregious conflict of interest problem in *United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill.1979) is entirely absent in this case. [These conflict of interest cases were previously considered by this court on the question of whether Kwong had an ongoing conflict of interest between his Section 515 Special Assistant appointment and his prior activities. *See* Order, at 228–30 (filed July 21, 1987) and Procedural Background Number 17.]

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), relied upon by defendants for the first time in the evidentiary hearing on August 7, 1987, RT 854–55 (remarks of defense counsel James J. Brosnahan), does not require a *per se* finding of a conflict of interest by reason of the mere cross designation of Kwong and Gruskin as Section 515 Special Assistants to the U.S. Attorney General. Indeed, this court finds it difficult to discern the aptness of *Vuitton* as aiding in the resolution of the instant dispute, because that case involved an appointment made by a court, based on an "inherent" judicial power, *see Vuitton*, 481 U.S. at 800–01, 107 S.Ct. at 2133–34, 95 L.Ed.2d at 754, rather than by an executive department acting pursuant to statute as in the instant case. In *Vuitton*, the Supreme Court held as an exercise of its supervisory power that a district court erred in appointing a private counsel to prosecute a contempt action when that counsel is also a beneficiary of the court order on which the contempt action is based. *See id.*, 481 U.S. at 809, 107 S.Ct. at 2138, 95 L.Ed.2d at 759. In contrast, the appointment authority in the case at bar is based upon 28 U.S.C. § 515, which is an express congressional enactment to overturn a Second Circuit Court of Appeals decision, *United States v. Rosenthal*, 121 F. 862 (2nd Cir. 1903) (superseded by statute as noted in *United States v. Balistrieri*, 779 F.2d 1191, 1208 (7th Cir.1985)), which had narrowed the appointment power of the Attorney General. *See e.g., In re Perlin*, 589 F.2d 260, 265–66 (7th Cir.1978) (discussing the legislative history of 28 U.S.C. § 515); *United States v. Prueitt*, 540 F.2d 995, 1001 n. 1 (9th Cir.1976), *cert. denied sub nom. Petersen v. United States*, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977); *In re Subpoena of Persico*, 522 F.2d 41, 58–60 (2nd Cir.1975).

Furthermore, except for one cognitive reference to the Fed.R.Crim.P. 6(e) case of *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), in the plurality portion of the Justice Brennan's opinion, there is no reference at all to cases dealing with grand jury matters in the *Vuitton* decision. *See Vuitton*, 481 U.S. at 814, 107 S.Ct. at 2141, 95 L.Ed.2d at 763. This plurality portion of the decision along with the dissent reflects a dispute within the Supreme Court over the application of the harmless error analysis where the court-appointed prosecutor has a conflict of interest in prosecuting a contempt. Notably there is no discussion in *Vuitton* of the application of the harmless error analysis required in grand jury proceedings, which is mandated by *United States v. Mechanik*, 475 U.S. 66, 72, 106

S.Ct. 938, 942–43, 89 L.Ed.2d 50, 57 (1986) (citing Fed.R.Crim.P. 52(a)).

Moreover, the vice found in the *Vuitton* situation, that of appointing attorneys with divided loyalties to fulfill a prosecutorial function, is not present in the instant case because, *at most*, the professional duties of Kwong and Gruskin bind them to the interests of sovereigns who have identical interests in the enforcement of their respective antitrust statutes through the institution of criminal prosecutions and the exercise of civil remedies. *See, e.g., Marin County Board of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925, 130 Cal.Rptr. 1, 3, 549 P.2d 833, 835 (Cal.1976) (California Supreme Court noting that the Cartwright Act "is patterned after the Sherman Act"); 1 Witkin, *Summary of California Law*, § 450, at 379 (8th ed.). More importantly, the facts of this case do not support an active, ongoing conflict of interest. In *Vuitton* not only was there an *ongoing* conflict of interest in *pending* claims, *see Vuitton*, 481 U.S. at 789–91, 804–05, 107 S.Ct. at 2128–29, 2136, 95 L.Ed.2d at 748, 757, but the court-appointed private counsel prosecuting the contempt also had been involved in the trademark infringement settlement agreement which resulted in a permanent injunction from which the contempt action arose.

Finally, defendants' reliance on *In re April 1977 Grand Jury Subpoenas: General Motors Corp. v. United States*, 573 F.2d 936 (6th Cir.1978), is misplaced since that appellate decision was vacated after on *en banc* hearing, *In re April 1977 Grand Jury Subpoenas: General Motors Corp. v. United States*, 584 F.2d 1366, 1368 n. 1 (6th Cir.1978), and has also received a substantial amount of criticism from other courts. *See, e.g., Birdman*, 602 F.2d at 562–63.

2. The evidence does not reveal any facts from which an inference can be drawn that any conduct on the part of Kwong or Gruskin demonstrated an active or ongoing conflict of interest.

A. Kwong and Gruskin were duly appointed, qualified and acting under the provisions of 28 U.S.C. § 515(a).

B. Nothing in Kwong's conduct in the presence of the federal grand jury supports manipulation or other impropriety on the part of Kwong.

C. Kwong's December 8th memorandum, written after the street and lighting grand jury investigation had ended, cannot and does not demonstrate an active conflict of interest. No authority is cited for the notion that an examination of the authorities relating to the permissible scope of activities of one in Kwong's position as a cross-designee constitutes evidence of a conflict of interest.

D. To the extent that Kwong's December 8th memorandum may be said to constitute recommendations to promptly institute civil action, it nonetheless does not constitute evidence of an active conflict of interest nor of a disclosure prohibited by Fed.R.Crim.P. 6(e), because an examination of ¶ 9 of the indictment on file herein and of Cal.Bus. & Prof.Code § 16750.1 (four-year statute of limitations under Cartwright Act) reveals a need for timely filing. In any case, there is no evidence, or evidence from which an inference can properly be drawn, that any such irregularity or defect, if such there be, could have affected the substantial right of defendants to have a consideration of the evidence against them by a grand jury free of the influences which Fed.R.Crim.P. 6(d) is designed to prevent. *Mechanik*, 475 U.S. at 71–72, 106 S.Ct. at 942–943, 89 L.Ed.2d at 57.

E. The facts show that after consideration of open legal questions on the issue of whether or not a cross-designee, who participated in a federal grand jury investigation, could be involved in a subsequent civil action, Kwong and Gruskin were sealed off from (1) the decision to bring a state civil action, and (2) the filing and prosecution of a state civil action.

3. At all relevant times, Kwong and Gruskin served as "attorneys for the government" as a result of being duly appointed and qualified Section 515 Special

Assistants and for purposes of Fed.R. Crim.P. 6(d), 6(e), and 54(c).

4. Kwong was authorized to be in the grand jury room, under Fed.R.Crim.P. 6(d), as an "attorney for the government" by virtue of his Special Assistant appointment under 28 U.S.C. § 515. *See, e.g., In re Perlin*, 589 F.2d 260 (7th Cir.1978); *United States v. Prueitt*, 540 F.2d 995 (9th Cir. 1976), *cert. denied sub nom. Petersen v. United States*, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977).

5. Kwong's conduct is not in any respect violative of Fed.R.Crim.P. 6(d).

6. Gruskin never appeared before the federal grand jury, Finding of Fact Number 37, and therefore could not have violated Fed.R.Crim.P. 6(d).

7. Even assuming *arguendo* that Kwong's appearance before the federal grand jury could somehow have violated Fed.R.Crim.P. 6(d) (by either an *assumed* conflict of interest or an *assumed* appearance of a conflict of interest), any such error could not have been more than harmless error. *See Mechanik*, 475 U.S. at 71–72, 106 S.Ct. at 942–943, 89 L.Ed.2d at 57 (holding that the harmless error rule, under Fed.R.Crim.P. 52(a), applies to " 'errors, defects, irregularities or variances' occurring before a grand jury just as [it] ... applie[s] ... to such error occurring in the criminal trial itself" and applying harmless error analysis to alleged Fed.R.Crim.P. 6(d) error raised *after* the trial commenced); *United States v. Benjamin*, 812 F.2d 548 (9th Cir. 1987) (extending *Mechanik* harmless error analysis to alleged Fed.R.Crim.P. 6(e)(2) irregularities occurring in grand jury proceedings which were brought to the trial court's attention *before* trial). *See also United States v. Taylor*, 798 F.2d 1337, 1340 (10th Cir.1986) (noting the *Mechanik* harmless error analysis applies to the question of "a defendant's right not to stand accused except upon a finding of probable cause" and concerns whether such alleged error "could have affected ... the grand jury's determination of probable cause").

Because there is no evidence that the federal grand jury was aware of Kwong's state position, *see* Finding of Fact Number 39, such assumed error could not have affected the integrity of the indictment returned by the federal grand jury. Furthermore, any *assumed* error resulting from Kwong's limited, subordinate role on the federal grand jury investigation team, Findings of Fact Numbers 38–44, could not have been more than harmless error, if any error. Additionally, there can be no substantial error on the part of Gruskin since he had no involvement before the federal grand jury. *See, e.g., United States v. Kilpatrick*, 821 F.2d 1456, 1468 (10th Cir.1987) (rejecting dismissal of the indictment where a violation of Fed.R.Crim.P. 6(d) called to the attention of the trial court *before* trial was not shown to be more than harmless error under *Mechanik* ). Therefore, Kwong's appearance before the federal grand jury and involvement in the signals and lighting grand jury investigation could not have affected the grand jury's decision to indict or the determination of probable cause, upon which the indictment was based.

8. There is no evidence before the court that either Kwong or Gruskin participated in the conduct of the California civil case, or that either made recommendations predicated upon the use of federal grand jury proceedings or materials in violation of Fed.R.Crim.P. 6(e)(3)(A)(i). Disclosure of matters occurring before the federal grand jury to Kwong and Gruskin was permissible under Fed.R.Crim.P. 6(e)(3)(A)(i), since both Kwong and Gruskin were "attorneys for the government," within the meaning of Fed.R.Crim.P. 54(c), and as a result of their Section 515 Special Assistant appointments pursuant to 28 U.S.C. § 515.

9. Kwong was authorized to discuss federal grand jury matters with Gruskin, and to reveal matters before the grand jury to Gruskin. Fed.R.Crim.P. 6(e)(3)(A)(i).

10. Neither Kwong nor Gruskin acted with a purpose to manipulate or use the federal grand jury for non-criminal ends in contravention of *United States v. Sells En-*

*gineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). The federal grand jury was not manipulated by Kwong or Gruskin to achieve other than the legitimate federal criminal ends being investigated by the grand jury. At all times the grand jury was within the control of the federal officials, from whom Kwong received his direction in his conduct before the grand jury.

11. Exhibit 5 did not constitute "matters occurring before the grand jury" since it was first seen by "attorneys for the government" working on the signals and lighting grand jury investigation *after* the return of the grand jury indictment and was never brought before the grand jury or in any way connected with the signals and lighting grand jury investigation.

12. There is no evidence of any "disclosure" or disclosure of "matters occurring before the grand jury," within the meaning of Fed.R.Crim.P. 6(e), *prior* to the return of the grand jury indictment on November 3, 1986. Therefore, the integrity of the grand jury indictment could not have been affected by any unauthorized disclosure of grand jury materials.

13. During the middle of December, 1986, and after the return of the grand jury indictment, Kwong gave the computer printout marked Exhibit 6 to Horn together with certain CalTrans contracts *after* the return of the indictment on file herein. Assuming *arguendo* that these materials given to Horn comprised "matters occurring before the grand jury," such *assumed* disclosure of grand jury materials *after* the return of the grand jury indictment could not have affected in any way the deliberations of the grand jury or have compromised the right of defendants to be indicted only upon probable cause. The resultant error, if any, is therefore harmless beyond a reasonable doubt. *See Mechanik,* 475 U.S. at 71–72, 106 S.Ct. at 942–943, 89 L.Ed.2d at 57.

14. There is no substantial evidence, or evidence from which an inference can be drawn, that the cross-designation of Kwong and Gruskin by the California Department of Justice and the Antitrust Division of the U.S. Department of Justice pursuant to 28 U.S.C. § 515(a) was motivated by a purpose to circumvent the holding of *Illinois v. Abbott & Associates, Inc.,* 460 U.S. 557, 103 S.Ct. 1356, 75 L.Ed.2d 281 (1983). *See* Findings of Fact Numbers 30 to 33.

15. Full consideration of all of the facts presented and arguments of counsel considered at the evidentiary hearing does not modify this court's original conclusion that, after application of the harmless error rule, the "[d]efendants have not satisfactorily presented evidence to show that the integrity of the indictment was affected by the alleged violations" since the defendants have failed to show "that the probable cause on which the indictment was based was lacking when considered independent of the alleged grand jury violations." Order, at 3 (filed Apr. 27, 1987).

## CONCLUSION

In compliance with the remand order of May 14, 1987, the foregoing Findings of Fact and Conclusions of Law, based upon the facts presented and argued at the evidentiary hearing, are transmitted to the Court of Appeals for the Ninth Circuit for further consideration of the pending motion in the appeal taken by the defendants on this court's interlocutory order denying defendants' motion to dismiss, or, in the alternative, for an evidentiary hearing.

IT IS SO ORDERED.